**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SHERRY MORTON, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>BCAP GDI 1, INC.<br><br>Defendant. | ) | Civil Action No. 1:24-cv-01432-JLH |

## ANSWER AND COUNTERCLAIMS[1]

Plaintiff Morton sold her business to Defendant pursuant to the Stock Purchase Agreement (the "SPA") referenced in Plaintiffs' Complaint, then violated numerous conditions of that sale (including destruction of documents, pocketing money into her personal accounts that her business improperly took from others, and engaging in behavior that was both detrimental and competitive to the business), creating defined contractual "Losses," for which she owed money to Defendant. While the aggrieved Defendant pursued millions of dollars in Losses in good faith through the contractual dispute resolution mechanism in the SPA, Plaintiffs launched this action as a pre-emptive strike to appear wronged despite owing millions to Defendant, unnecessarily increasing Defendant's Losses rather than addressing the harm caused by Plaintiff Morton's breaches and wrongful acts. Defendant, by its undersigned counsel, answers Plaintiffs' Complaint as follows:

## I. PRELIMINARY DEFENSES

**First Preliminary Defense (Failure to State a Claim) – Plaintiffs' Counts 1 (Breach of SPA (Nonpayment)) and 3 (declaratory judgment challenging Defendant's use of the Indemnity Holdback).** Counts 1 and 3 of the Complaint fail to state a claim because the two

[1] Where capitalized terms are used, but not defined, such terms shall have their meaning from either the Complaint or the SPA.

claims assume that Defendant's allegations concerning Plaintiffs' misconduct and breaches are "unfounded," (Compl. ¶ 27), while ignoring the plain language of the SPA that permits the very Indemnity Holdback utilized by Defendant to cover Losses that it incurred as a result of Plaintiff Morton's conduct. Plaintiffs allege that money Defendant withheld from the otherwise scheduled release of the Indemnity Holdback was a breach of the terms of the SPA. Compl. ¶¶ 17-19. However, under the plain language of the SPA, Defendant is not obligated to release the Indemnity Holdback if there are offsetting Losses caused by Plaintiff Morton. SPA Section 7.9 states, "[f]or any indemnified Losses, the Buyer Parties may utilize the Indemnity Holdback **in its sole discretion** to remunerate the Buyer Parties for such Losses." (Emphasis supplied.) Thus, once Defendant had followed the SPA's provisions in making claims that identified specific conduct by Plaintiffs that caused the Defendant Losses, the Defendant was properly exercising its discretion specifically granted by the SPA when it withheld amounts from the Indemnity Holdback.

**Second Preliminary Defense (Failure to State a Claim) – Plaintiffs' Count 2 (Breach of SPA (Lien))**. In Count 2 (Compl. ¶¶ 30-35), Plaintiffs omit relevant language from Section 7.13 of the SPA that permits the very lien that they complain about:

> Notwithstanding the foregoing, the Buyer shall have the right to collaterally assign (or has already collaterally assigned) to its senior lender all of its right, title and interest in, to and under this agreement as collateral for the financing arrangements provided (or to be provided) to buyer to assist with the consummation of the acquisition contemplated hereby.

The lien mentioned in Plaintiffs' Complaint was filed by Defendant's senior lender when the Defendant financed the acquisition contemplated in the SPA. The language in the SPA omitted by Plaintiffs not only contemplated the exact lien about which Plaintiffs complain, but it also expressly permitted Defendant's conduct, precluding the claim asserted in Count 2 of the Complaint.

**Third Preliminary Defense (Failure to State a Claim) – Plaintiffs' Count 2 (Breach of SPA (Lien)**. Count 2 is entirely based on speculation as it alleges breaches "to the extent" that Defendant's not paying Plaintiff Morton from the Holdback Amount is attributable to the lien "due to an inability to obtain a release of the funds from Pinnacle Bank's security filing." Compl. ¶ 34. Not only do Plaintiffs know this allegation is untrue, but they do not actually allege that this allegation is true. The "to the extent" language poses a (false) hypothetical that Plaintiffs do not even assert. Defendant granted the lien to its senior lender to effectuate the transaction, which the SPA expressly permits in the language Plaintiffs conveniently omitted from their partial recitation of Section 7.13. Defendant properly notified Plaintiff Morton in writing through a claim under the SPA that the Indemnity Holdback was being used to compensate for Losses. Pinnacle Bank's security filing was never the reason Defendant did not release the Indemnity Holdback to Plaintiff Morton, and Plaintiffs do not allege otherwise in the Complaint.

**Fourth Preliminary Defense (Failure to State a Claim) – Count 4 (Breach of NAFTA Agreement)**. Count 4 fails to state a claim because Section 8.2 of the NAFTA Agreement, referenced in the Complaint, specifically permits a termination for cause: "[NAFTA] or the Company may terminate this Agreement, effective immediately upon written notice to the other, in the event that the other party materially breaches this Agreement." Plaintiffs do not dispute that the factual bases asserted by Defendant for terminating the NAFTA Agreement—namely, that Plaintiffs materially breached the NAFTA Agreement by failing to provide the services required thereunder—would constitute a proper termination for cause. Further, apart from labeling these bases for termination as "manufactured" and "false," Count 4 does not identify any actual fact asserted by Defendant in the NAFTA Agreement termination letter that Plaintiffs contend to be untrue.

## II. RESPONSES TO THE COMPLAINT'S SPECIFIC ALLEGATIONS INTRODUCTION[2]

Complaint ¶1. *This is a breach of contract case arising from Boathouse's efforts to avoid its clear obligations to Morton and NAFTA under the plain terms of a Stock Purchase Agreement and related agreement entered into as of November 1, 2023 (the "SPA"). Boathouse has encountered financial difficulties as a result of its poor business operations following the closing of the SPA, and it now seeks to excuse its obligations to Morton and NAFTA through baseless accusations of contractual breaches and misconduct. Boathouse's empty claims do not excuse it from its contractual obligations, and Plaintiffs have filed this Complaint to recover amounts to which they are rightfully entitled.*

Answer ¶1. Denied.

Complaint ¶2. *Morton is an individual and a citizen of Arizona.*

Answer ¶2. Defendant admits that Plaintiff Morton is an individual and lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 2 of the Complaint.

Complaint ¶3. *NAFTA is an Arizona non-profit association with its principal place of business in Arizona.*

Answer ¶3. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 3 of the Complaint.

Complaint ¶4. *Boathouse is a Delaware corporation with its principal place of business in Virginia. Thus, Boathouse is a citizen of both Delaware and Virginia.*

Answer ¶4. Admitted.

Complaint ¶5. *This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.*

[2] For sake of review, Defendant includes the Headings as used in the Complaint, and includes the numbered allegations in each corresponding paragraph in *italics* before Defendant's response.

Answer ¶5. Admitted.

Complaint ¶6. *Boathouse is subject to personal jurisdiction in this Court because it is a citizen of Delaware and because the SPA contains a forum selection clause requiring any actions brought under the SPA to be filed in Delaware.*

Answer ¶6. Admitted.

Complaint ¶7. *Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Boathouse is a citizen of Delaware and the applicable forum selection clause requires this action to be filed in Delaware.*

Answer ¶7. Admitted.

Complaint ¶8. *Morton created a company called Millennium Health & Fitness, Inc. ("Millennium"), an Arizona corporation, to engage in the business of providing fitness programs and related business. Through her efforts over the course of more than three decades, Morton developed Millennium into a successful business with multiple offices in the United States.*

Answer ¶8. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 8 of the Complaint.

Complaint ¶9. *In 2022, Boathouse approached Morton through a broker about the possibility of purchasing Millennium. Negotiations between the parties ultimately failed, and no transaction occurred.*

Answer ¶9. Defendant admits the allegation in paragraph 9 of the Complaint that Plaintiff Morton and Defendant did not reach an agreement regarding the sale of Millennium in 2022. Defendant denies the allegation in paragraph 9 of the Complaint that Defendant approached Plaintiff Morton about the possibility of purchasing Millennium. Such conversations were initiated

by Plaintiff Morton or her broker. All allegations in paragraph 9 of the Complaint not specifically admitted are hereby denied.

Complaint ¶10. *In mid-2023, however, Boathouse approached Morton's broker again in an effort to renew negotiations. On August 19, 2023, the parties entered into a non-binding letter of intent with regard to the potential purchase of Millennium by Boathouse.*

Answer ¶10. Defendant denies the allegations in the first sentence of paragraph 10 of the Complaint. Such conversations were initiated by Plaintiff Morton or her broker. Defendant admits allegations in the second sentence of paragraph 10 of the Complaint.

Complaint ¶11. *This time, the parties were able to reach an agreement for Boathouse to purchase the stock of Millennium, and the SPA was ultimately signed on November 1, 2023. A true and correct copy of the SPA is attached and filed under seal as Exhibit 1.*

Answer ¶11. Admitted, while noting that the portions of the SPA that were included are true and correct, the SPA filed as Exhibit 1 is incomplete as it does not include page 1 of the SPA nor the schedules and exhibits (other than Exhibit A) to the SPA. It appears that page 1 was properly included in the redacted version of the SPA later filed by Plaintiffs; however, the schedules and exhibits (other than Exhibit A) are still not included.

Complaint ¶12. *Through the SPA, Boathouse agreed to pay to Morton the amount stated in the SPA, subject to certain expenses and two types of hold-backs. See Exh. 1, § 1.1(b).*

Answer ¶12. Admitted.

Complaint ¶13. *Boathouse retained a portion of the purchase price as an "Indemnity Holdback," which was intended to be available to cover any Losses (as defined in the SPA) resulting from certain types of alleged contractual breaches discovered after the Closing. Boathouse was to pay half of the Indemnity Holdback to Morton within 368 days of the Closing,*

*subject to any Losses that were (i) settled between the parties during the prior year or (ii) identified through a written notice before the 12-month anniversary of the Closing. See Exh. 1, § 7.13. The balance of the Indemnity Holdback was to be paid to Morton within 3 days of the 2-year anniversary of the Closing, subject to similar conditions.*

Answer ¶13. Defendant admits the allegations in paragraph 13 of the Complaint that it retained a portion of the purchase price as an "Indemnity Holdback," which was intended to be available to cover any Losses (as defined in the SPA) resulting from certain types of alleged contractual breaches discovered after the Closing. Defendant admits that the SPA called for Defendant to release up to half of the Indemnity Holdback to Plaintiff Morton, subject to reductions for any Losses that were (i) settled between the parties during the prior year **or** (ii) identified through a written notice before the 12-month anniversary of the Closing, but Defendant denies that such release was to occur within 368 days of the Closing Date. Defendant admits that the SPA called for Defendant to release to Plaintiff Morton any remaining balance of the Indemnity Holdback not claimed by Defendant but denies that such release was to occur within 3 days of the 2-year anniversary of the Closing. Such releases were to occur within 3 Business Days of the first and second anniversaries of the Closing, respectively, in each case, subject to the conditions outlined above. All allegations in paragraph 13 of the Complaint not specifically admitted are hereby denied.

Complaint ¶14. *Boathouse was specifically prohibited from permitting the Indemnity Holdback to be subject to any lien, covenant or other limitation with respect to any of Boathouse's or, after the Closing, Millennium's lenders. Despite this contractual prohibition, Boathouse allowed its lender, Pinnacle Bank, to file a UCC-1 claiming a security interest in all assets, including all deposit accounts, of Millennium.*

Answer ¶14. Defendant denies the allegation in paragraph 14 of the Complaint that Defendant was specifically prohibited from permitting the Indemnity Holdback to be subject to any lien, covenant or other limitation with respect to any of Defendant's or, after the Closing, Millennium's lenders. Defendant admits the allegation in paragraph 14 of the Complaint that Defendant allowed Pinnacle Bank to file a UCC-1 claiming a security interest in all of its assets, including all deposit accounts of Millennium, but Defendant denies that such action was a violation of the SPA. Section 7.13 of the SPA specifically exempts from any prohibition the lien filed by Pinnacle Bank on November 1, 2023 relating to Defendant's consummation of the acquisition contemplated by the SPA, stating "[n]otwithstanding the foregoing, the Buyer shall have the right to collaterally assign (or has already collaterally assigned) to its senior lender all of its right, title and interest in, to and under this agreement as collateral for the financing arrangements provided (or to be provided) to buyer to assist with the consummation of the acquisition contemplated hereby." All allegations in paragraph 14 of the Complaint not specifically admitted are hereby denied.

Complaint ¶15. *Boathouse also retained a separate amount as an "Escrow Holdback" to cover potential claims arising specifically from certain types of losses referred to as "Mis-certification Losses." The Escrow Holdback is to be released to Morton, subject to deductions for any applicable Losses, within 3 days following the third anniversary of the Closing. See Exh. 1, § 7.14.*

Answer ¶15. Defendant denies the allegation in paragraph 15 of the Complaint that Boathouse retained a separate amount as an "Escrow Holdback" to cover potential claims arising specifically from certain types of losses referred to as "Mis-Certification Losses." The Escrow Amount is, and at all times since the Closing has been, held by the law firm Dickinson

Wright PLLC in its capacity as Escrow Agent under the SPA. Dickinson Wright PLLC represented Plaintiff Morton in connection with the sale of Millennium to Defendant and continues to represent Plaintiffs in the matter at hand. Defendant admits the allegation in paragraph 15 of the Complaint that the Escrow Agent is to release any remaining uncontested balance of the Escrow Holdback to Plaintiff Morton, subject to deductions for any applicable Losses, but denies that such release is to occur within 3 days following the third anniversary of the Closing. Such release is to occur within three Business Days following the third anniversary of the Closing. Furthermore, Defendant's Mis-Certification Losses already exceed the $500,000.00 amount of the Escrow Holdback, so all amounts in the Escrow Holdback should be released to Defendant immediately, and there will be no value remaining three Business Days following the third anniversary of the Closing for release to Plaintiff Morton. All allegations in paragraph 15 of the Complaint not specifically admitted are hereby denied.

Complaint ¶16. *Boathouse also entered into a separate agreement ("NAFTA Agreement") in connection with the SPA, through which it agreed to pay NAFTA $100,000 per year for certain services, with the term of the agreement ending October 31, 2028. A true and correct copy of the NAFTA Agreement is attached as Exhibit 2.*

Answer ¶16. Admitted.

Complaint ¶17. *On October 31, 2024, one day before the one-year anniversary of the Closing, Boathouse delivered a written notice to Morton asserting a variety of alleged breaches of the SPA and advising that it intended to use the entire Indemnity Holdback to recover a portion of its alleged Losses.*

Answer ¶17. Admitted.

Complaint ¶18. *Additionally, Boathouse advised that it intended to take, and has taken, the entire Indemnity Holdback for the payment of claims for which Boathouse contends Morton is responsible.*

Answer ¶18. Denied. Defendant did not take the Indemnity Holdback but rather retained such funds, which were already in its possession, in accordance with Sections 7.9 and 7.13 of the SPA.

Complaint ¶19. *Boathouse provided a separate notice to NAFTA advising that it was immediately terminating the NAFTA Agreement, allegedly "for cause," claiming that NAFTA had failed to perform its obligations under the agreement and had violated a confidentiality provision of that agreement. In fact, NAFTA had fully complied with its obligations under the NAFTA Agreement and had violated none of its provisions.*

Answer ¶19. Defendant admits the allegation in paragraph 19 of the Complaint that Defendant provided a separate notice to Plaintiff NAFTA advising that Defendant was immediately terminating the NAFTA Agreement for cause. Defendant denies the allegation in paragraph 19 of the Complaint that Plaintiff NAFTA had fully complied with its obligations under the NAFTA Agreement and had not violated any provision thereof. All allegations in paragraph 19 of the Complaint not specifically admitted are hereby denied.

Complaint ¶20. *Morton responded to Boathouse's claims on November 4, denying Boathouse's allegations and demanding the payment of the first half of the Indemnity Holdback.*

Answer ¶20. Defendant admits that, on November 4, 2024, Plaintiff Morton sent a letter to Defendant, requesting that Defendant provide additional documentation supporting certain of its claims against Plaintiffs, a copy of which is attached hereto as Exhibit 01. Defendant denies that this letter demanded any payment. Defendant denies that Plaintiff Morton "den[ied]

Boathouse's allegations" in this letter. In fact, Plaintiff Morton only denied two of Defendant's nine claims in this letter, specifically saying "Seller has fully rebutted" item 1 from the Defendant's October 31, 2024 claim and "denying in its entirety the allegation of wrongdoing" relating to item 4 from the Defendant's October 31, 2024 claim. None of the other seven items in Defendant's October 31, 2024 claim where denied, refuted, or rebutted in Plaintiff Morton's November 4, 2024 letter. Later, on November 7, 2024, in a separate letter from Plaintiff NAFTA to Defendant, Plaintiffs denied in part item 7 from the Defendant's October 31, 2024 claim. At no other time did Plaintiffs send an official notice under the SPA refuting any of the items claimed in Defendant's October 31, 2024 claim or as clarified and further substantiated in Defendant's December 4, 2024 claim and response to Plaintiff Morton's November 4, 2024 letter. The SPA specifically states In Section 7.7 that "[i]f the recipient [of a Direct Indemnity Claim Notice under the SPA, as Defendant provided on October 31, 2024 and clarified and further substantiated on December 4, 2024] does not provide a written notice of dispute within such thirty (30) days, the recipient will be deemed to have accepted responsibility for the Losses set forth in such notice and will have no further right to contest the validity of such notice." Again, beyond the items specifically mentioned above, Plaintiffs never provided a written notice of dispute for Defendant's properly claimed Losses and Mis-Certification Losses. All allegations in paragraph 20 of the Complaint not specifically admitted are hereby denied.

<u>Complaint ¶21</u>. *Boathouse replied on December 4, providing documents it claims support its position.*

<u>Answer ¶21</u>. Defendant admits the allegation in paragraph 21 of the complaint that Defendant replied on December 4, 2024, to Plaintiffs' request for documentation supporting Defendant's claims. Defendant's response, a copy of which is attached hereto as Exhibit 02,

included more than 60 attachments pertaining to Defendant's claims. Under the SPA, Plaintiff Morton was obligated to refute the claims that were made on October 31, 2024 and further clarified and substantiated on December 4, 2024. As detailed above in Answer ¶21, the only items from Defendant's claims under the SPA that Plaintiffs denied, refuted, or rebutted through an official notice as required by the SPA were items 1 and 4 (item 1: unpaid payroll and item 4: Mis-Certification Losses for the failure to deliver and theft of files and Intellectual Property), as well as part of item 7 (the NAFTA Agreement subset of Transaction Documents). Plaintiffs failed to refute Defendant's other claims under the SPA (item 2: unpaid accounts payable; item 3: inaccurate financial statements; item 5: failure to effectuate transition of ownership; item 6: improper sharing of confidential information and competing with the Company; item 7: breaches of Transaction Documents (not including the NAFTA Agreement); item 8: Special Indemnity for employment-related claim; and item 9: Mis-Certification Losses for payment for services to the EPA workforce) and are therefore barred from litigating these claims here, which Plaintiffs are doing through its allegations of supposed facts in the Complaint and through its requests in Counts 1 and 3 where it requests money from the Indemnity Holdback that instead should be applied to the Losses from the items listed above in Defendant's October 31, 2024, claim, as further clarified and substantiated on December 4, 2024. All allegations in paragraph 21 of the Complaint not specifically admitted are hereby denied.

Complaint ¶22. *Boathouse's claims, however, are not supported by the SPA or the facts. Instead, Boathouse appears to be crafting excuses not to pay the amount it currently owes, possibly because its lender refuses to release its security interest in the Indemnity Holdback, the existence of which, in and of itself, constitutes a breach of the SPA.*

Answer ¶22. Denied.

Complaint ¶23. *Likewise, Boathouse's unilateral and unjustified termination of the NAFTA Agreement has been spurred not by NAFTA's failure to perform, but by Boathouse's poor business operations that have led to Boathouse's inability to meet its payment obligations.*

Answer ¶23. Denied.

**COUNT ONE: BREACH OF THE SPA (NON-PAYMENT)**

Complaint ¶24. *Morton incorporates and re-alleges all of the foregoing averments as if specifically set forth herein.*

Answer ¶24. Defendant incorporates by reference its responses to the allegations in paragraphs 1 to 23 of the Complaint as if fully set forth herein.

Complaint ¶25. *The SPA is a valid, binding contract between Morton and Boathouse, among other related parties.*

Answer ¶25. Admitted.

Complaint ¶26. *Section 7.13 of the SPA required Boathouse to release to Morton half of the Indemnity Holdback by November 4, 2024.*

Answer ¶26. Denied.

Complaint ¶27. *Boathouse has failed and refused to do so, opting instead to create unfounded allegations in an effort to avoid its contractual obligations.*

Answer ¶27. Defendant admits that it has not released the Indemnity Holdback to Plaintiff Morton and denies the remaining allegations in paragraph 27 of the Complaint. All allegations in paragraph 27 of the Complaint not specifically admitted are hereby denied.

Complaint ¶28. *Boathouse's failure to make the first payment of the Indemnity Holdback to Morton constitutes a breach of contract.*

Answer ¶28. Denied.

Complaint ¶29. *Morton has suffered damages as a result of the breach and is entitled to recover damages in the amount of one-half of the Indemnity Holdback.*

Answer ¶29. Denied.

**COUNT TWO: BREACH OF THE SPA (LIEN)**

Complaint ¶30. *Morton incorporates and re-alleges all of the foregoing averments as if specifically set forth herein.*

Answer ¶30. Defendant incorporates by reference its responses to the allegations in paragraphs 1 to 29 of the Complaint as if fully set forth herein.

Complaint ¶31. *Section 7.13 of the SPA required Boathouse to ensure that no lien was placed on the Indemnity Holdback.*

Answer ¶31. Denied.

Complaint ¶32. *On or shortly after the date of the Closing, Pinnacle Bank, Boathouse's lender, recorded a UCC-1 that includes the Indemnity Holdback as security.*

Answer ¶32. Admitted.

Complaint ¶33. *Boathouse's failure to prevent Pinnacle Bank from filing a UCC-1 that asserts a security interest in the Indemnity Holdback constitutes a breach of the SPA.*

Answer ¶33. Denied.

Complaint ¶34. *To the extent Boathouse has failed and refused to pay to Morton the portion of the Indemnity Holdback to which she is entitled due to an inability to obtain a release of the funds from Pinnacle Bank's security filing, Morton has been damaged as a result of Boathouse's failure to comply with its obligations under Section 7.13.*

Answer ¶34. Denied.

Complaint ¶35. *Morton has suffered damages as a result of the breach and is entitled to recover damages of one-half of the Indemnity Holdback.*

Answer ¶35. Denied.

**COUNT THREE: DECLARATORY JUDGMENT (USE OF HOLDBACK)**

Complaint ¶36. *Morton incorporates and re-alleges all of the foregoing averments as if specifically set forth herein.*

Answer ¶36. Defendant incorporates by reference its responses to the allegations in paragraphs 1 to 35 of the Complaint as if fully set forth herein.

Complaint ¶37. *Boathouse has advised Morton that it has now taken the entire Indemnity Holdback for its own uses, contending the funds have been used to make payments for which it claims Morton is liable.*

Answer ¶37. Denied. Defendant did not take the Indemnity Holdback for its own uses, but rather Defendant properly retained such amounts in accordance with Sections 7.9 and 7.13 of the SPA.

Complaint ¶38. *The claims asserted by Boathouse through its October 31 and December 4 notices have, in whole or in part, been manufactured to avoid Boathouse's obligations to Morton.*

Answer ¶38. Denied.

Complaint ¶39. *The Court should determine whether Boathouse's claims have merit and, after finding they do not, declare that Boathouse's unilateral determination to use the Indemnity Holdback is improper and that Boathouse is required to pay half to Morton and replenish the Indemnity Holdback with the other half until such time as that amount becomes due and payable to Morton.*

Answer ¶39. Defendant admits that the Court should determine whether Defendant's claims have merit, but Defendant denies the remaining allegations in paragraph 39 of the Complaint. All allegations in paragraph 39 of the Complaint not specifically admitted are hereby denied.

**COUNT FOUR: BREACH OF CONTRACT (NAFTA AGREEMENT)**

Complaint ¶40. *NAFTA incorporates and re-alleges the averments in paragraphs 1-23 as if specifically set forth herein.*

Answer ¶40. Defendant incorporates by reference its responses to the allegations in paragraphs 1 to 39 of the Complaint as if fully set forth herein.

Complaint ¶41. *The NAFTA Agreement is a valid and binding contact between NAFTA and Boathouse.*

Answer ¶41. Defendant denies the allegation in paragraph 41 of the Complaint that the NAFTA Agreement is a valid and binding contract between Plaintiff NAFTA and Defendant, but Defendant admits that the NAFTA Agreement was a valid and binding contract between Plaintiff NAFTA and Defendant from November 1, 2023, the date on which it was executed, until Defendant terminated such Agreement for cause effective October 31, 2024. All allegations in paragraph 41 of the Complaint not specifically admitted are hereby denied.

Complaint ¶42. *NAFTA fully performed its obligations under the NAFTA Agreement and did not breach of provisions of that agreement.*

Answer ¶42. Denied.

Complaint ¶43. *Despite NAFTA's performance under and compliance with the NAFTA Agreement, Boathouse manufactured false allegations of "cause" for termination and has unilaterally declared the NAFTA Agreement to have been terminated.*

Answer ¶43. Denied.

Complaint ¶44. *Boathouse's improper termination of the NAFTA Agreement constitutes a breach of contract.*

Answer ¶44. Denied.

Complaint ¶45. *NAFTA has been damaged as a result of the breach and is entitled to recover the full amount it was due to receive under the NAFTA Agreement through October 28, 2028.*

Answer ¶45. Denied.

## III. AFFIRMATIVE DEFENSES

**First Affirmative Defense (Waiver) – Plaintiffs' Counts 1 (Breach of SPA (Non-Payment)) and 3 (Declaratory Judgment (Use of Holdback))**

Even if all of the allegations set for in the Complaint are true, Plaintiff Morton's claims are untimely since Plaintiff Morton failed to follow the requirements outlined int the SPA for asserting them. The SPA required certain notices be issued within set time periods, and delivered through specific methods to be valid. (*see* SPA §7.7). As the Complaint alleges in ¶17, Defendant delivered "a written notice to Morton asserting a variety of alleged breaches of the SPA" on October 31, 2024 using these approved methods. Exhibit 03. As stated in Answer ¶¶20-21, in the November 4, 2024 letter, Plaintiff Morton only denied two of Defendant's nine claims from the Defendant's October 31, 2024 claim, specifically saying "Seller has fully rebutted" item 1 from Defendant's October 31, 2024 claim and "denying in its entirety the allegation of wrongdoing" relating to item 4 from Defendant's October 31, 2024 claim. None of the other seven items in Defendant's October 31, 2024 claim where denied, refuted, or rebutted in Plaintiff Morton's November 4, 2024 letter. SPA Section 7.7 states that "[i]f the recipient [of a Direct Indemnity Claim Notice under the SPA]

does not provide a written notice of dispute within such thirty (30) days, the recipient will be deemed to have accepted responsibility for the Losses set forth in such notice and will have no further right to contest the validity of such notice." When Defendant transmitted another December 4, 2024 Notice further substantiating Defendant's claims, Plaintiff Morton did not timely respond to that Notice, nor did she send any responsive Notice using the methods required under SPA Section 9.4 ("Notices"). SPA Section 9.4(a) requires Notices be transmitted "prepaid, by nationally recognized overnight courier that issues a receipt or other confirmation of delivery." Plaintiff Morton's failure to adhere to these requirements concerning Notices means she has "accepted responsibility for the Losses" claimed by Defendant, which precludes Plaintiffs' claims relating to her receiving payment from the Indemnity Holdback (and precludes Plaintiff Morton's denials of all of Defendant's counterclaims below other than the first and fourth, which Plaintiff Morton did timely deny and refute under the SPA's contractual requirements).

**Second Affirmative Defense (Prior Material Breach) – Plaintiffs' Counts 1 (Breach of the SPA (Non-payment of the Indemnity Holdback), 2 (Breach of the SPA (Lien), and 3 (Declaratory Judgment (Use of Holdback))**. Even if all of the allegations set forth in the Complaint are true, Plaintiffs' Count 1 fails due to Plaintiffs' prior material breaches as set forth in the counterclaims below. Plaintiff Morton concealed, misrepresented, or misstated material information concerning Company records, deleted or diverted Company Intellectual Property for her personal use, failed to cooperate with efforts to assist with the transition to new ownership, and breached confidentiality provisions with the Company. Plaintiff NAFTA, under Plaintiff Morton's direction and in violation of her and Plaintiff NAFTA's restrictive covenants, sought to compete with the Defendant and solicit the Defendant's customers.

**Third Affirmative Defense (Setoff) – Plaintiffs' Counts 1 (Breach of the SPA (Non-payment of the Indemnity Holdback), 2 (Breach of the SPA (Lien), 3 (Declaratory Judgment (Use of Holdback) and 4 (Breach of Contract (NAFTA Agreement))**. Even if all the allegations set forth in the Complaint are true, each of Plaintiffs' Counts 1, 2, 3, and 4 fail because any amounts owed are subject to Defendant's right of "Set-off" under Section 7.9 of the SPA. Section 7.9 specifically permits the Defendant to use the Indemnity Holdback to compensate for Losses, and states the Defendant could rely on that provision:

> to set off any amounts payable to any of the Buyer Parties under this Agreement against any amounts payable to the Seller, whether under this Agreement, any other Transaction Document or otherwise, including with respect to any sums owed to Seller by Buyer or the Company relating to this Agreement. The exercise of such set-off by a Buyer Party, whether or not ultimately justified, shall not constitute a breach of this Agreement. Neither the exercise nor the failure to exercise such right of set-off shall constitute an election of remedies or limit the Buyer Parties in any manner in the enforcement of any other remedies that may be available to them.

**Fourth Affirmative Defense (Failure to State a Claim) – Plaintiffs' Count 2 (Breach of the SPA (Lien)).** Even if all the allegations set forth in the Complaint are true, Plaintiffs' Count 2 fails to state a claim upon which relief can be granted, as Section 7.13 of the Agreement expressly permits the Defendant's use of a lien, and states in relevant part, "Notwithstanding the foregoing, the Buyer shall have the right to collaterally assign (or has already collaterally assigned) to its senior lender all of its right, title and interest in, to and under this agreement as collateral for the financing arrangements provided (or to be provided) to buyer to assist with the consummation of the acquisition contemplated hereby."

**Fifth Affirmative Defense (Unclean Hands) – Plaintiffs' Count 3 (Declaratory Judgment (Use of Holdback))**. Even if all the allegations set forth in the Complaint are true, Plaintiffs' Count 3, where Plaintiffs seek a declaratory judgement, fails because Plaintiffs' (particularly Plaintiff Morton's) misrepresentations, concealment, lack of cooperation, bad faith,

and other behavior as set forth in the counterclaims below preclude Plaintiffs from being entitled to equitable relief.

**Sixth Affirmative Defense (Prior Material Breach) – Plaintiffs' Count 4 (Breach of Contract (NAFTA Agreement))**. Even if all the allegations set forth in the Complaint are true, Plaintiffs' Count 4 fails because, as enumerated in the Answer and Counterclaim, Plaintiffs' material breaches justified Defendant's termination of the NAFTA Agreement. On October 31, 2024, Defendant provided Plaintiffs with written notice of termination for cause in accordance with Section 8.2 of the NAFTA Agreement. The breaches outlined in the notice of termination were material.

## IV. COUNTERCLAIMS

1. Defendant, by its undersigned counsel, for its counterclaims against Plaintiffs alleges as follows:

### Jurisdiction

2. The Court has subject matter jurisdiction over Defendant's counterclaims under 28 U.S.C. § 1367(a) because they are so related to Plaintiffs' claims that they form part of the same case or controversy under Article III of the United States Constitution, and under pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

### Venue

3. Venue is proper in this district under 28 U.S.C. § 1391(b), in that Plaintiffs are subject to personal jurisdiction in this district with respect to this action, and Section 9.9 of the SPA requires that "any Claim arising out of or in connection with this Agreement… shall exclusively be brought in the state and federal courts located in the State of Delaware."

**Parties**

4. Defendant incorporates by reference as if fully set forth herein paragraphs 2, 3, and 4 of the Answer.

**Facts**

5. Defendant and Plaintiff Morton entered into the SPA and the other Transaction Documents, including the Consulting Agreement and the NAFTA Agreement on November 1, 2023.

6. The SPA and the Transaction Documents set forth the terms on which Plaintiff Morton sold all of the issued and outstanding equity interests in Millennium to Defendant.

7. Under the SPA, Plaintiff Morton made certain covenants and representations and warranties to Defendant about Millennium, including, without limitation, representations and warranties about Millennium's financial statements, financial condition, regulatory compliance, contracts compliance, intellectual property, record keeping, and potential liabilities.

8. Plaintiff Morton's consulting company, Lerwick 13 Consulting LLC ("Lerwick"), agreed to abide by certain covenants, including, without limitation, to maintain the confidentiality of Millennium's and Defendant's confidential information and to take reasonable steps to effectuate the transfer of ownership of Millennium to Defendant.

9. Plaintiff NAFTA is an Arizona non-profit association owned and managed by Plaintiff Morton.

10. Plaintiff NAFTA provides training and certifications to fitness instructors.

11. Plaintiff NAFTA provided such services to Millennium personnel prior to the Plaintiff Morton's sale of Millennium to Defendant.

12. On November 1, 2023, Plaintiff Morton caused Plaintiff NAFTA to enter into the NAFTA Agreement with Millennium to continue providing such services to Millennium personnel under the terms of the NAFTA Agreement, which are described more fully below.

13. The SPA requires Plaintiff Morton to indemnify Defendant for any breaches of those representations, warranties or covenants.

14. After the Closing, Defendant discovered that Plaintiff Morton had not delivered what she promised in the SPA or Transaction Documents and had breached certain of the covenants, representations and warranties in the SPA and Transaction Documents.

15. Defendant and Millennium endeavored for months to reach a mutually-acceptable solution with Plaintiffs to address Plaintiffs' breaches of the SPA and the Transaction Documents.

16. On October 24, 2024, Defendant and Millennium formally terminated the Consulting Agreement for cause and demanded repayment of the fees that Millennium had thus far paid to Lerwick by delivering to Plaintiff Morton and Lerwick the Notice of Termination for Cause and Claim for Monetary Damages (the "Lerwick Termination Notice") attached hereto as Exhibit 04 in accordance with the procedures set forth in the Consulting Agreement.

17. Defendant and Millennium terminated the NAFTA Agreement for cause on October 31, 2024, and demanded repayment of the fees that Millennium had thus far paid to Plaintiff NAFTA by delivering to Plaintiffs the Notice of Termination for Cause and Claim for Monetary Damages (the "NAFTA Termination Notice") attached hereto as Exhibit 05 in accordance with the procedures set forth in the NAFTA Agreement.

18. Defendant sent the Direct Indemnity Claim Notice (the "Direct Indemnity Claim Notice") attached hereto as Exhibit 03 to Plaintiff Morton on October 31, 2024, outlining the claims described herein and demanding indemnification for Defendant's Losses.

19. Plaintiff Morton responded to the Direct Indemnity Claim Notice on November 4, 2024, requesting that Defendant provide additional documentation to support Defendant's claims in the Direct Indemnity Claim Notice. *See* Exhibit 01.

20. Plaintiff Morton responded to the Direct Indemnity Claim Notice a second time on November 7, 2024, this time demanding that Defendant release to her $250,000.00 from the Indemnity Holdback. *See* Exhibit 06.

21. On November 7, 2024, Plaintiff NAFTA responded to the NAFTA Termination notice claiming that Defendant's termination of the NAFTA Agreement was itself a breach by Defendant of the NAFTA Agreement and the SPA. *See* Exhibit 07.

22. On November 15, 2024, Defendant and Millennium responded to Plaintiff NAFTA's November 7, 2024 letter, providing a more detailed explanation of the grounds on which Defendant and Millennium terminated the NAFTA Agreement and reiterating their demand for repayment of the fees Millennium had paid to Plaintiff NAFTA. *See* Exhibit 08.

23. On December 4, 2024, Defendant responded to Plaintiff Morton's November 4 and November 7, 2024 letters, providing, as Plaintiff Morton requested, additional information and documentation to substantiate Defendant's claims in the Direct Indemnity Claim Notice. *See* Exhibit 02 for the December 4, 2024 letter. Certain of the exhibits to such December 4, 2024 are included as exhibits below.

24. Plaintiffs then brought this suit against Defendant on December 31, 2024.

**FIRST COUNTERCLAIM – BREACH OF THE SPA (UNPAID PAYROLL)**

25. Defendant repeats and realleges paragraphs 1 through 24 hereof, as if fully set forth herein.

26. Under the SPA, Plaintiff Morton was required to pay or properly disclose Millennium's liabilities and payment obligations accrued prior to Closing.

27. The Closing of the transaction under the SPA was on November 1, 2023.

28. On November 7, 2023 (six days after Closing), Millennium paid its payroll provider $212,268.85 for Millennium's employee wages for work performed from October 16, 2023 through October 31, 2023.

29. Such payment should have been paid by Plaintiff Morton or properly accrued as accounts payable and disclosed by Plaintiff Morton prior to the Closing.

30. Neither Plaintiff Morton nor Millennium paid this payroll before Closing or as part of the flow of funds at Closing.

31. Neither Plaintiff Morton nor Millennium accrued this payroll as accounts payable before Closing.

32. Neither Plaintiff Morton nor Millennium disclosed in the disclosure schedules to the SPA that this payroll was neither paid nor accrued as accounts payable prior to the Closing.

33. Defendant and Millennium have suffered damages constituting "Losses" under the SPA as a result of Plaintiff Morton's actions as described in this First Counterclaim.

34. The term "Losses," as defined in Exhibit A of the SPA, includes costs of investigations, expenses and fees, "including court costs and attorneys' or other professionals' fees and expenses paid or incurred."

35. Under Section 7.2 of the SPA, Plaintiff Morton must indemnify Defendant and its Affiliates (including Millennium) "against, from and in respect of any and all Losses that are incurred by them based upon, arising out of or otherwise in respect of: (a) the inaccuracy in or breach of any representation or warranty made by the Company or the Seller in this Agreement,

any Transaction Document, or in any statement or certificate delivered pursuant to Section 6.1, or (b) the non-fulfillment or breach by or on behalf of the Seller or, at or prior to the Closing, the Company, of any unwaived covenant (for the sake of clarity, only covenants, and not representations or warranties), obligation or agreement, in each case, as contained in this Agreement, any Transaction Document, or in any statement or certificate delivered pursuant to Section 6.1."

36. By reason of the foregoing, Plaintiff Morton is liable for the Losses in the amount of $212,268.85, plus attorneys' fees and costs of investigation.

**SECOND COUNTERCLAIM - BREACH OF THE SPA (UNPAID ACCOUNTS PAYABLE)**

37. Defendant repeats and realleges paragraphs 1 through 36 hereof, as if fully set forth herein.

38. Under Section 2.11(c) of the SPA, Plaintiff Morton represented to Defendant that all of Millennium's accounts payable and notes payable had been paid in full as of the Closing Date.

39. Such representation proved to be untrue, as Millennium had unpaid accounts payable (excluding the unpaid payroll described in the First Counterclaim) of $147,824.45 immediately following the Closing.

40. Under Section 7.2 of the SPA, Plaintiff Morton is required to indemnify Defendant (and Millennium) for any Losses arising from any inaccuracy or breach of any of the representations, warranties or covenants made to Defendant by Plaintiff Morton or Millennium.

41. Defendant and Millennium have suffered damages as a result of Plaintiff Morton's actions as described in this Second Counterclaim.

42. By reason of the foregoing, Plaintiff Morton is liable for Losses in the amount of $147,824.45, plus attorneys' fees and costs of investigation.

## THIRD COUNTERCLAIM - BREACH OF THE SPA (INACCURATE FINANCIAL STATEMENTS)

43. Defendant repeats and realleges paragraphs 1 through 42 hereof, as if fully set forth herein.

44. Section 5.2 of the SPA required Plaintiff Morton to "deliver, or cause to be delivered, to [Defendant] all Confidential Information."

45. As defined in the SPA, Confidential Information includes "any information concerning the business and affairs of [Millennium], or the Assets, that is not generally available to the public."

46. Prior to Closing, the information and figures in Millennium's Financial Statements, including its balance sheet and cash balance, were not generally available to the public.

47. As defined in the SPA, Assets include "all Cash…held by [Millennium]."

48. As defined in the SPA, Cash means "the aggregate amount of unrestricted cash, cash equivalents, certificates of deposits, marketable securities and short-term investment of [Millennium]."

49. Section 2.15(a) of the SPA required Plaintiff Morton to attach a correct and complete copy of Millennium's Financial Statements as of September 30, 2023, to the SPA.

50. Under Section 2.15(b) of the SPA, Plaintiff Morton represented to Defendant that the Financial Statements she provided to Defendant, which included the consolidated unaudited balance sheet, income statement and statement of cash flows of Millennium as of September 30, 2023, were "true, correct and complete in all material respects."

51. The September 2023 balance sheet provided to Defendant by Plaintiff Morton pursuant to Sections 5.2 and 2.15(a) of the SPA showed a balance of $0.00 for Millennium's total accounts payable.[3]

52. The September 2023 balance sheet provided to Defendant by Plaintiff Morton pursuant to Sections 5.2 and 2.15(a) of the SPA did not show any accrued payroll for the November 7 payroll described above in the First Counterclaim.

53. Section 2.16 of the SPA required Plaintiff Morton to disclose to Defendant (to the extent not already identified in the Financial Statements) any liabilities, indebtedness or obligations of Millennium existing as of the Closing Date.

54. Plaintiff Morton's disclosure in Section 2.16 of the Disclosure Schedules to the SPA was "None." *See* Exhibit 16.

55. The September 2023 balance sheet provided to Defendant by Plaintiff Morton pursuant to Sections 5.2 and 2.15(a) of the SPA showed that Millennium had a cash balance of $7,576,098.21.

56. This cash balance in the Closing Balance Sheet,[4] as certified by the Closing Certificate, to which Plaintiff Morton provided her confirmatory signature and to which Plaintiff Morton did not file an Objection Notice, diminished to $104,530.45, a reduction of $7,471,567.76 that was not disclosed nor otherwise permitted by the SPA. *See* Exhibit 19.

---

[3] Defendant will produce a copy of such balance sheet suitably marked after seeking a protective order from this Court.

[4] Defendant will produce a copy of such balance sheet suitably marked after seeking a protective order from this Court.

57. The SPA did not include any provisions or mechanics for cash and working capital targets or adjustments whereby Millennium or Plaintiff Morton was authorized to remove cash reflected on the September 2023 balance sheet from Millennium's accounts before Closing.

58. Before finalizing and signing the SPA, Plaintiff Morton insisted that cash and working capital targets and adjustments be removed from the mechanics of the SPA. Though it is atypical for such provisions to be excluded from an agreement like the SPA, Defendant agreed to their removal after explaining to Plaintiff Morton the potential consequences of doing so.

59. Section 9.6 of the SPA states that "This Agreement (including the Exhibits and Disclosure Schedules hereto, which are incorporated by reference herein and deemed a part of this Agreement) and the other Transaction Documents constitute the entire agreement between the parties with respect to the subject matter hereof and referenced herein, and supersede and terminate any prior agreements between the parties or their respective Affiliates (written or oral) with respect to the subject matter hereof, including that certain Letter of Intent, dated as of April 15, 2022, by and between the Company and Boathouse Capital."

60. Plaintiff Morton breached Sections 2.15(a), 2.16, and 5.2 of the SPA by delivering the equity interests of Millennium to Defendant with a cash deficit of $7,471,567.76.

61. Defendant and Millennium have suffered damages as a result of Plaintiff Morton's actions described in this Third Counterclaim.

62. By reason of the foregoing, Plaintiff Morton is liable for Losses in the amount of $7,471,567.76, plus attorneys' fees and costs of investigation.

63. The SPA stipulates that Claims by Defendant "under Section 7.2(b) and Section 7.3" or "for inaccuracies or breaches of any Fundamental Representation or Government Contracts Matters Representation" are Excluded Claims.

64. Section 7.2(b) of the SPA requires that Plaintiff Morton indemnify Defendant for "the non-fulfillment or breach by or on behalf of [Plaintiff Morton] or, at or prior to the Closing, [Millennium], of any unwaived covenant, … obligation or agreement, [or] any Transaction Document."

65. Defendant's claims under this Third Counterclaim are Excluded Claims because the Losses arising therefrom are the result of Plaintiff Morton's breaches of unwaived covenants under Section 5 of the SPA.

66. Losses arising from Excluded Claims are not subject to the $750,000.00 cap on indemnification (the "Indemnification Cap") nor the Threshold Amount set forth in Section 7.5 of the SPA.

67. Therefore, Plaintiff Morton's indemnification obligations with respect to the Losses described in this Third Counterclaim are not subject to the Indemnification Cap nor the Threshold Amount.

68. Being that the damages described in Counterclaims 1 and 2 are also breaches of the representations in the SPA that the Financial Statements are correct and complete and of the covenants in Section 5.2 of the SPA, the damages for this Third Counterclaim should also include the amounts listed in the First and Second Counterclaims, making Plaintiff Morton liable for Losses in the aggregate amount of $7,831,661.06, plus attorneys' fees and costs of investigation, for this Third Counterclaim, none of which are subject to the Indemnification Cap nor the Threshold Amount.

**FOURTH COUNTERCLAIM - BREACH OF THE SPA (FAILURE TO DELIVER AND THEFT OF COMPANY INTELLECTUAL PROPERTY)**

69. Defendant repeats and realleges paragraphs 1 through 68 hereof, as if fully set forth herein.

70. Under Section 2.9 of the SPA, Plaintiff Morton represented that "[i]mmediately following the Closing, all of the Assets will be owned, leased or available for use by the Company Parties on terms and conditions substantially identical to those under which, immediately prior to the Closing, each Company Party owns, leases, uses or holds available for use such Assets."

71. Under Section 2.12(e) of the SPA, Plaintiff Morton represented to having "taken commercially reasonable actions to protect all Company IP that is a Trade Secret from unauthorized use and unauthorized disclosure" and to having "maintained such Trade Secrets in confidence so as to preserve their status as Trade Secrets."

72. Under Section 2.12(i) of the SPA, Plaintiff Morton represented that Millennium had maintained and complied with commercially reasonable policies and procedures concerning IT Infrastructure and data security.

73. Under Section 2.33(b)(iv)(B) and (P) of the SPA, Plaintiff Morton represented that Millennium had "complied in all material respects with all Applicable Laws pertaining to each Government Contract, Government Vendor Subcontract, Teaming Agreement or Government Bid" and "materially complied with all data security, cybersecurity, and physical security systems and procedures required by its Government Contracts."

74. Under Section 5.3 of the SPA, Plaintiff Morton represented that she had disclosed and assigned to Millennium all Intellectual Property developed by her on behalf of Millennium or relating to Millennium's business, and any Intellectual Property intended for future use in Millennium's business. To the extent not already assigned to Millennium, Plaintiff Morton agreed to assign any such Intellectual Property to Millennium prior to the Closing.

75. Plaintiff Morton also represented under Section 5.3 of the SPA that she "delivered to the Company all copies or embodiments of such Intellectual Property in any media in her possession on or before Closing."

76. Section 5.3 of the SPA requires Plaintiff Morton, at the request of Defendant or Millennium, to "return or destroy all copies of confidential and proprietary information of any Company Party (including the return of any electronic media or device in which such information is contained)."

77. On August 3, 2023, Plaintiff Morton instructed Millennium's IT vendor, Atruent, via email to download files from Millennium's computer system to an external drive and then delete those files from the system, and to do so without creating a ticket documenting such actions.

78. Plaintiff Morton's email to Atruent on August 3, 2023, stated "The key is not to create a ticket with MHF as this is confidential. I would like all the files backed up on an external drive so that I can have it in my possession and verified on my end then we can delete the files."

79. An Atruent employee replied to Plaintiff Morton the same day, stating "I have created an internal ticket for this task so as not to alert anyone of what we're doing at MHF."

80. Atruent confirmed via email on August 22, 2023, that it had downloaded and deleted the files as Plaintiff Morton instructed, stating "As discussed, you said we were OK to delete the CEO Sharepoint [sic] site Documents without going through the site to verify all folders and documents."

81. Federal Acquisition Regulation § 4.703(a) requires companies doing business with the U.S. government to maintain government contract records for at least three years following the expiration or termination of a government contract.

82. Plaintiff Morton caused Millennium to violate such requirement by directing Atruent to delete files from Millennium's records, many of which related to Millennium's government contracts.

83. Defendant has repeatedly demanded that Plaintiff Morton return all such files (and any others relevant to Millennium that may be in her possession), including in Defendant's official correspondence to Plaintiff Morton on October 31, 2024, and December 4, 2024.

84. Plaintiff Morton has not returned the files she directed Atruent to delete or any other files or documents.

85. In response to Defendant's demands, Plaintiff Morton claimed that none of the files in her possession, including those she directed Atruent to download and delete, pertain to Millennium, but rather are her own personal files or belong to Plaintiff NAFTA.

86. Plaintiff Morton also claimed that any files she directed to be deleted that did pertain to Millennium were duplicates of files existing elsewhere in Millennium's system.

87. Defendant engaged Advanced Forensic Investigative Solutions LLC ("AFIS"), an independent firm specializing in computer digital forensics, to investigate Plaintiff Morton's actions.

88. AFIS summarized its findings in a report (the "AFIS Report"), a copy of which is attached hereto as Exhibit 10. The AFIS Report shows that 2,517 of the 2,959 files that Plaintiff Morton caused to be deleted did not reside anywhere else in Millennium's SharePoint environment.

89. The cost of the AFIS Report was $23,943.75.

90. AFIS was unable to recover the deleted files, but the AFIS Report contains a list of the names of the deleted files.

91. The AFIS Report also shows that 389 of the 2,517 non-duplicative files contain "MHF" (short for "Millennium Health and Fitness") in the file name. Numerous other file names contain "Millennium" and other words relating to Millennium's business, including the names of customers, contracts, and employees of Millennium.

92. Defendant provided Plaintiff Morton with a copy of the AFIS Report on December 4, 2024.

93. The cost of business development and information technology support to recreate information contained in the deleted files was $28,940.22.

94. Defendant also incurred costs of $1,222.80 for the time Millennium personnel dedicated to addressing Plaintiff Morton's lack of cooperation in transferring control of certain Millennium accounts.

95. As a result of Plaintiff Morton's improper deletion and withholding of business files, pricing models, proposal documents and other files and information, Millennium was unable to successfully bid on various government contracts, including (i) FBI J. Edgar Hoover (JEH) Fitness Center Support Services and 19 Offsite Facilities (Contract No. 15F06724F0000304), (ii) ICE HQ Fitness Center Support Services (Contract No. 70CMSW24FR0000043), and (iii) U.S.M.C. Certified Athletic Trainers and Strength and Conditioning Specialist Services for the Human Performance Branch (Contract No. M0026425D0002).

96. The value of such contracts together exceeded $65,000,000.00.

97. As detailed in Exhibit 02, multiplying such amount by Millennium's typical win rate and profit margin for similar contracts yields a conservative estimate of $1,300,000.00 of lost profits for Millennium caused by Plaintiff Morton's breaches described in this Fourth Counterclaim.

98. The SPA does not prohibit Defendant from recovering consequential damages, such as lost profits, as "Losses."

99. The term "Loss" includes "Mis-Certification Losses."

100. Under Section 7.3(f) of the SPA, "Mis-Certification Losses" are comprised of "any Losses, claw backs by a customer, (as reasonably determined by the Buyer) relating to any Contracts disclosed by the Company or Seller under Schedule 2.33(b)(ii) or Schedule 2.33(b)(iv)(B) or relating to any inaccuracy or any breach of Section 2.33(b)(ii) or Section 2.33(b)(iv)(B) of this Agreement."

101. Section 7.9 of the SPA states that "the Buyer Parties may utilize the Escrow Amount (and the Seller and Buyer agree to direct the Escrow Agent to disburse funds) to remunerate the Buyer Parties for such Mis-Certification Losses."

102. Plaintiff Morton breached Section 2.12(e) of the SPA because she did not "[take] commercially reasonable actions to protect all Company IP that is a Trade Secret from unauthorized use and unauthorized disclosure" or "[maintain] such Trade Secrets in confidence so as to preserve their status as Trade Secrets." Instead, Plaintiff Morton took deliberate action to ensure that such information would be in her possession and available for her unauthorized use and disclosure after the Closing.

103. Plaintiff Morton breached Section 2.12(i) of the SPA because, under her management, Millennium did not maintain and comply with commercially reasonable policies and procedures concerning IT Infrastructure and data security as evidenced by the fact that Plaintiff Morton arranged via email for thousands of confidential Millennium files to be downloaded to her external hard drive and deleted from Millennium's system while openly acknowledging that she

intended to retain these files for her own personal use and not in connection with Millennium's business.

104. Plaintiff Morton breached Sections 2.33(b)(iv)(B) and (P) of the SPA because, under her management, Millennium did not "[comply] in all material respects with all Applicable Laws pertaining to each Government Contract, Government Vendor Subcontract, Teaming Agreement or Government Bid" or "materially [comply] with all data security, cybersecurity, and physical security systems and procedures required by its Government Contracts."

105. Plaintiff Morton breached Section 5.3 of the SPA because she did not: (a) "[deliver] to the Company all copies or embodiments of such Intellectual Property in any media in her possession on or before Closing;" (b) "return or destroy all copies of confidential and proprietary information of any Company Party (including the return of any electronic media or device in which such information is contained)" when Defendant and Millennium requested; and (c) disclose and assign to Millennium all Intellectual Property developed by her on behalf of Millennium or relating to Millennium's business and all Intellectual Property intended for future use in Millennium's business.

106. Defendant's Losses arising from Plaintiff Morton's breaches of Sections 2.33(b)(ii) and 2.33(b)(iv)(b) of the SPA are Mis-Certification Losses.

107. Defendant and Millennium have suffered damages as a result of Plaintiff Morton's actions as described in this Fourth Counterclaim.

108. By reason of the foregoing, Plaintiff Morton is liable for Losses (all of which are Mis-Certification Losses) in the amount of $1,354,106.77, plus attorneys' fees and costs of investigation, and Defendant is entitled to equitable relief with respect to the files deleted by Plaintiff Morton.

109. Defendant's claims under this Fourth Counterclaim are Excluded Claims because the Losses arising therefrom are the result of Plaintiffs' breaches of Transaction Documents, unwaived covenants under Section 5 of the SPA, and representations and warranties in Section 2.33(b)(iv)(B) of the SPA.

110. Losses arising from Excluded Claims are not subject to the Indemnification Cap nor the Threshold Amount set forth in Section 7.5 of the SPA.

111. Therefore, Plaintiffs' indemnification obligations with respect to the Losses described in this Fourth Counterclaim are not subject to the Indemnification Cap nor the Threshold Amount.

**FIFTH COUNTERCLAIM - BREACH OF THE SPA (FAILURE TO TAKE REASONABLE STEPS TO EFFECTUATE TRANSITION OF OWNERSHIP)**

112. Defendant repeats and realleges paragraphs 1 through 111 hereof, as if fully set forth herein.

113. On the Closing Date, pursuant to Section 6.1(g) of the SPA, Plaintiff Morton entered into a consulting agreement (the "Consulting Agreement") with Millennium through Lerwick.

114. Under the Consulting Agreement, Plaintiff Morton, acting through Lerwick, agreed to devote her best efforts in directing and ensuring a productive transition of Millennium's operations and relationships following the sale of Millennium from Plaintiff Morton to Defendant.

115. Section 7(D)(i)(E) of the Consulting Agreement required both Lerwick and Plaintiff Morton to comply will all written lawful policies of Millennium and to follow all reasonable directives of Millennium's Board of Directors or the designee thereof. Failure on the part of Plaintiff Morton or Lerwick to comply with such policies or directors would constitute a breach for which Defendant would be entitled to terminate the Consulting Agreement for "Cause."

116. Plaintiff Morton and Lerwick breached the Consulting Agreement by failing to provide the services in the manner required thereby and by repeatedly disregarding the reasonable directives of the designee of Millennium's Board of Directors.

117. The Consulting Agreement is a "Transaction Document" under the SPA.

118. Pursuant to Section 7.2(b) of the SPA, Plaintiff Morton is required to indemnify Defendant for any breach or non-fulfillment of any Transaction Document.

119. The SPA, including Section 5.5 thereof, together with the other Transaction Documents, required Plaintiff Morton to take reasonable steps to effectuate the transition of ownership of Millennium from Plaintiff Morton to Defendant.

120. Plaintiff Morton failed to relinquish administrator access to Millennium's accounts on QuickBooks and Vimeo on the Closing Date, and continued to delay doing so after multiple requests from Millennium's executive team after the Closing Date.

121. After the Closing Date, Plaintiff Morton instructed a Millennium employee to delete videos relating to Plaintiff NAFTA from Millennium's Vimeo account, and transfer those videos to Plaintiff NAFTA's Vimeo account, further delaying Plaintiff Morton's transfer of Millennium's Vimeo account after the Closing.

122. Plaintiff Morton repeatedly gave directions to Millennium employees without authorization after the Closing Date.

123. Plaintiff Morton's unauthorized communications with Millennium employees and government officials after the Closing Date disrupted Millennium's business operations and required Millennium's executive team to intervene.

124. Defendant and Millennium have suffered damages as a result of Plaintiff Morton's actions as described in this Fifth Counterclaim.

125. By reason of the foregoing, Plaintiff Morton is liable for Losses in the amount of $1,834.20 for working time spent by Millennium personnel to address the breaches described in this Fifth Counterclaim, plus attorneys' fees and costs of investigation.

126. Defendant's claims under this Fifth Counterclaim are Excluded Claims because the Losses arising therefrom are the result of Plaintiffs' breaches of Transaction Documents and unwaived covenants under Section 5 of the SPA.

127. Losses arising from Excluded Claims are not subject to the Indemnification Cap nor the Threshold Amount set forth in Section 7.5 of the SPA.

128. Therefore, Plaintiffs' indemnification obligations with respect to the Losses described in this Fifth Counterclaim are not subject to the Indemnification Cap nor the Threshold Amount set forth in Section 7.5 of the SPA.

## SIXTH COUNTERCLAIM - BREACH OF THE SPA (IMPROPER SHARING OF CONFIDENTIAL INFORMATION AND COMPETING WITH MILLENNIUM)

129. Defendant repeats and realleges paragraphs 1 through 128 hereof, as if fully set forth herein.

130. Under Section 5.1(a) of the SPA, Plaintiff Morton agreed to "keep confidential and not directly or indirectly reveal, report, publish, disclose or transfer any Confidential Information, except for disclosure to attorneys, accountants or other advisors" and to refrain from using any Confidential Information for her own benefit or the benefit of any other person or entity, other than Millennium and Defendant and their affiliates.

131. Plaintiff Morton agreed to similar obligations in the Consulting Agreement and the NAFTA Agreement.

132. Plaintiff Morton and Defendant entered into the Equity Holder Restrictive Covenant Agreement (the "Restrictive Covenant Agreement"), attached hereto as Exhibit 09, on November 1, 2023.

133. Section 2 of the Restrictive Covenant Agreement prohibits Plaintiff Morton from "providing or offering products or services that are competitive, in whole or in part, with" those of Millennium until October 31, 2026.

134. Since the Closing, Plaintiff NAFTA, at Plaintiff Morton's direction, has submitted bids for government contracts within the same NAICS codes in which Millennium operates. *See* email correspondence between Plaintiffs and Defendant attached hereto as Exhibit 18.

135. Plaintiff NAFTA did not operate within such NAICS codes prior to the Closing.

136. Prior to Plaintiffs' bidding on such government contracts, Defendant informed Plaintiff Morton that her or Plaintiff NAFTA's pursuing such government contracts would be a violation of their restrictive covenants under the SPA and the Transaction Documents and demanded that Plaintiffs not pursue such contracts.

137. The Consulting Agreement, NAFTA Agreement and Restrictive Covenant Agreement are "Transaction Documents" under the SPA.

138. Plaintiff Morton is required to indemnify Defendant and Millennium for all Losses arising from Plaintiff Morton's breach of the SPA or any Transaction Document.

139. As described in the Fourth Counterclaim, Plaintiff Morton misappropriated Millennium business files.

140. Plaintiff Morton has used such misappropriated files to benefit herself, Plaintiff NAFTA and possibly others, including FCW Fitness, Inc., which provides fitness and training services as a government contractor and is owned by Plaintiff Morton's daughter, and Roxie

Hinton, a former Millennium employee who now works for Plaintiff NAFTA and provides fitness training services as an independent contractor.

141. Defendant and Millennium have suffered damages as a result of Plaintiff Morton's actions as described in this Sixth Counterclaim.

142. By reason of the foregoing, Plaintiff Morton is liable for Losses in an amount to be proven at trial, plus attorneys' fees and costs of investigation.

143. Defendant's claims under this Sixth Counterclaim are Excluded Claims because the Losses arising therefrom are the result of Plaintiffs' breaches of Transaction Documents and unwaived covenants under Section 5 of the SPA.

144. Losses arising from Excluded Claims are not subject to the Indemnification Cap nor the Threshold Amount set forth in Section 7.5 of the SPA.

145. Therefore, Plaintiffs' indemnification obligations with respect to the Losses described in this Sixth Counterclaim are not subject to the Indemnification Cap nor the Threshold Amount set forth in Section 7.5 of the SPA.

**SEVENTH COUNTERCLAIM - BREACH OF THE SPA (BREACHES OF THE TRANSACTION DOCUMENTS)**

146. Defendant repeats and realleges paragraphs 1 through 145 hereof, as if fully set forth herein.

147. The NAFTA Agreement, Consulting Agreement, and Restrictive Covenant Agreement are "Transaction Documents" under the SPA.

148. Plaintiff Morton is required to indemnify Defendant and Millennium for all Losses arising from Plaintiff Morton's breach of the SPA or any Transaction Document.

149. Under Section 5.4 of the SPA, Plaintiff Morton agreed to "ensure that Plaintiff NAFTA honors [the NAFTA Agreement]."

150. Under the NAFTA Agreement, Plaintiff Morton, acting through Plaintiff NAFTA, agreed to provide certain training and certification services to Millennium.

151. Plaintiffs represented in the NAFTA Agreement that the services provided by Plaintiff NAFTA thereunder would be provided "in accordance with the highest industry standards."

152. Defendant and Millennium raised concerns with Plaintiffs regarding the quality of Plaintiff NAFTA's services within weeks of the NAFTA Agreement's commencement.

153. Plaintiff Morton acknowledged such concerns via email on December 19, 2023, noting that she had "taken a deep dive into Plaintiff NAFTA's offerings for trainings and certifications and realized that the trainings needed to be updated."

154. In August 2024, Millennium engaged an industry expert to conduct an independent evaluation of Plaintiff NAFTA's services.

155. The expert's evaluation questioned the credibility of Plaintiff NAFTA's fitness certifications due to Plaintiff NAFTA's lack of accreditation, noting specifically that Plaintiff NAFTA lacks accreditation for all of its certifications other than its Group Exercise Instructor (GEI) Certification. The evaluation further stated that Plaintiff NAFTA's courses lack the depth, breadth, and rigor of those offered by other certification bodies such as the American College of Sports Medicine, the National Academy of Sports Medicine, the National Strength and Conditioning Association, and the American Council on Exercise.

156. Schedule 1 of the NAFTA Agreement states that "[NAFTA] will provide training (*and accompanying NAFTA Certifications*) to any Company staff member (that is, employee, independent contractor, or other Company affiliate) requested by the Company (in its discretion) that attends the following courses listed, *and any others offered by NAFTA*" (emphasis added).

157. The NCCA GEI Certification is the only accredited certification offered by Plaintiff NAFTA.

158. When Millennium sought to enroll certain of its personnel in Plaintiff NAFTA's NCCA GEI Workshop, Plaintiff Morton asserted that the NAFTA Agreement "does not include the NAFTA NCCA GEI course, nor materials nor exam" and improperly demanded additional payment for such items.

159. Plaintiff Morton subsequently acknowledged that the NCCA GEI Workshop is available to Millennium personnel under the NAFTA Agreement, but continued to demand additional payment for the exam and certification.

160. Plaintiff NAFTA's own website indicates that individuals who register for the NCCA GEI Workshop will receive the relevant training, materials, and exam.

161. Plaintiffs breached the NAFTA Agreement by failing to provide the services in the manner required thereby.

162. Defendant terminated the NAFTA Agreement effective October 31, 2024, and demanded repayment of all amounts previously paid by Millennium thereunder, by delivering to Plaintiffs the Notice of Termination for Cause and Claim for Monetary Damages attached hereto as Exhibit 05.

163. Plaintiff NAFTA has not returned return any portion of the payments made by Millennium under the NAFTA Agreement.

164. Plaintiffs' actions described above, individually and in the aggregate, constitute a material breach of the NAFTA Agreement.

165. As described herein, Plaintiff Morton materially breached the terms of the Restrictive Covenant Agreement.

166. As described herein, Plaintiff Morton and Lerwick materially breached the terms of the Consulting Agreement.

167. Under Section 7 of the Consulting Agreement, Millennium may terminate the Consulting Agreement for "Cause" in several situations, including, without limitation, Plaintiff Morton's breach of any of the representations, warranties or covenants in Sections 2, 3, and 5 of the SPA or "failure to perform any material aspect of the Services."

168. As detailed above, Plaintiff Morton breached numerous representations, warranties, and covenants in the SPA and Lerwick failed to provide the services it and Plaintiff Morton promised to provide to Millennium under the Consulting Agreement.

169. Millennium terminated the Consulting Agreement for Cause effective October 24, 2024, and demanded repayment of the $95,833.41 previously paid by Millennium thereunder, by delivering to Plaintiff Morton and Lerwick the Notice of Termination for Cause and Claim for Monetary Damages attached hereto as Exhibit 04.

170. Neither Plaintiff Morton nor Lerwick has returned any portion of the payments made by Millennium to Lerwick under the Consulting Agreement.

171. Millennium engaged other consultants to perform the services that should have been provided by Lerwick and Plaintiff Morton under the Consulting Agreement.

172. Millennium paid such consultants a total of $78,243.00, as detailed in Exhibit 15.

173. Defendant and Millennium have suffered damages as a result of Plaintiff Morton's actions as described in this Seventh Counterclaim.

174. By reason of the foregoing, Plaintiff Morton is liable for Losses in the amount of $281,061.89 ($106,985.48 for payments made under the NAFTA Agreement, $95,833.41 for payments made under Consulting Agreement, and $78,243.00 for the cost of services to replace

those that Plaintiff Morton and Lerwick were to perform under the Consulting Agreement), plus attorneys' fees and costs of investigation.

175. Defendant's claims under this Seventh Counterclaim are Excluded Claims because the Losses arising therefrom are the result of Plaintiffs' breaches of Transaction Documents and unwaived covenants under Section 5 of the SPA.

176. Losses arising from Excluded Claims are not subject to the Indemnification Cap nor the Threshold Amount set forth in Section 7.5 of the SPA.

177. Therefore, Plaintiffs' indemnification obligations with respect to the Losses described in this Seventh Counterclaim are not subject to the Indemnification Cap nor the Threshold Amount set forth in Section 7.5 of the SPA.

**EIGHTH COUNTERCLAIM - BREACH OF THE SPA (SPECIAL INDEMNITY FOR EMPLOYMENT-RELATED CLAIMS)**

178. Defendant repeats and realleges paragraphs 1 through 177 hereof, as if fully set forth herein.

179. Defendant and Plaintiff Morton entered into a Side Letter Agreement on November 1, 2023 (the "Side Letter Agreement"), a copy of which is attached hereto as Exhibit 11.

180. The Side Letter Agreement is a valid, binding agreement between Defendant and Plaintiff Morton.

181. Under the Side Letter Agreement, Plaintiff Morton agreed to pay any expenses incurred by Millennium relating to the claims set forth in Section 2.14 of the Disclosure Schedules to the SPA.

182. Dickinson Wright PLLC represented Millennium in such matters both before and after the Closing.

183. On August 9, 2024, Millennium received an invoice from Dickinson Wright PLLC for $5,522.00 for legal services provided to Millennium in connection with the matters described in the Side Letter Agreement.

184. Defendant has provided Plaintiff Morton with a copy of such invoice and requested that Plaintiff Morton reimburse Millennium for the full amount set forth therein.

185. Plaintiff Morton has not reimbursed Millennium for any portion of the $5,522.00 Millennium paid to Dickinson Wright PLLC.

186. Defendant and Millennium have suffered damages as a result of Plaintiff Morton's actions as described in this Eighth Counterclaim.

187. By reason of the foregoing, Plaintiff Morton is liable for Losses in the amount of $5,522.00, plus attorneys' fees and costs of investigation.

**NINTH COUNTERCLAIM - BREACH OF THE SPA (UNDISCLOSED LIABILITY)**

188. Defendant repeats and realleges paragraphs 1 through 187 hereof, as if fully set forth herein.

189. Under Section 2.16 of the SPA, Plaintiff Morton represented that "None of the Company Parties has any liabilities, indebtedness or obligations of any nature (whether absolute, accrued, contingent or otherwise, whether known or unknown, matured or unmatured and whether due or to become due) (each, a "Liability" and collectively, the "Liabilities"), except: (a) Liabilities that are accrued and reflected on the balance sheet of the Company Parties as of the Statement Date, (b) Liabilities that have arisen in the Ordinary Course of Business since the Statement Date and that, individually or in the aggregate, have not had and would not be reasonably expected to have a Material Adverse Effect, (c) obligations to be performed after the Closing under any Contracts, or (d) Liabilities that are listed on Schedule 2.16. None of the Company Parties is a

guarantor nor is it otherwise liable for any obligation (including indebtedness) of any other Person."

190. Plaintiff Morton's disclosure in Section 2.16 of the Disclosure Schedules to the SPA was "None."

191. Millennium was party to a contract under which it provided services to employees of the U.S. Environmental Protection Agency (the "EPA").

192. Participating EPA employees paid for such services through a deduction from each of their paychecks of approximately $13.00 per pay period.

193. On November 18, 2020, Plaintiff Morton was informed that Millennium's services were being terminated and that effective November 30, 2020, Millennium should cease collecting payments from EPA employees without requiring any further action on the part of any EPA employee. *See* Exhibit 12.

194. Plaintiff Morton did not direct Millennium to cease collecting payments from EPA employees after November 30, 2020.

195. Despite the government's providing clear instructions for Millennium to cease collecting payments without requiring any specific action on the part of EPA employees to have such payments stop, when Millennium received its first wave of unauthorized deposits on December 14, 2020, Plaintiff Morton instructed a Millennium employee to notify participating EPA employees that Millennium would provide them with access to Millennium's virtual exercise classes (in lieu of the in-person classes previously provided) and that the EPA employees would continue to be charged unless they affirmatively opted out of such services. *See* Exhibit 13.

196. A Millennium employee notified Plaintiff Morton via email on December 17, 2020 (a copy of which is attached hereto as Exhibit 14), that at least some of the participants likely never received an email to cancel their memberships with Millennium.

197. A representative from the EPA contacted Millennium on January 26, 2021 about an EPA employee who was improperly charged for services by Millennium in December 2020.

198. Millennium denied receiving any such payment, indicating that Millennium had closed the bank account where EPA employees' membership fees were previously collected and that "any attempt to deposit funds would be restricted/kicked back." *See* Exhibit 17.

199. However, the month before, on December 14, 2020, Dubuque Bank, which maintained the accounts where such funds were deposited, notified Plaintiff Morton that "[a] number of electronic credits came in for closed account xxx56175 for $13.00/each. We have credited your operating account with them."

200. In the period after November 30, 2020, Millennium collected 13,558 deposits from EPA employees for a total of $176,140.29.

201. The EPA employees' payments were not "kicked back" as Plaintiff Morton claimed, but rather deposited into a different Millennium account.

202. These payments continued until Defendant discovered the deposits from EPA employees after the Closing, at which point Defendant informed Dubuque Bank to stop accepting these payments, and instead of directing them to Millennium's operating account at the bank, they should all be returned to the account from which they originated.

203. On October 23, 2023 (just before the Closing Date), Plaintiff Morton withdrew $549,000.00 (inclusive of the $176,140.29 from the EPA employees after November 30, 2020)

from Millennium's Dubuque Bank operating account and directed such amount to her personal bank account.

204. Defendant's Losses for this Counterclaim 9 are Mis-Certification Losses because they relate to a breach of Section 2.33(b)(iv)(B) of the SPA.

205. Because Defendant's Losses for this Counterclaim 9 are Mis-Certification Losses, Defendant is entitled to remuneration for such Losses from the Escrow Amount under Section 7.9 of the SPA.

206. Defendant is entitled to the entire Escrow Amount ($500,000.00) because its Mis-Certification Losses, together with the amounts claimed in the Fourth Counterclaim, exceed $500,000.00.

207. Defendant and Millennium have suffered damages as a result of Plaintiff Morton's actions as described in this Ninth Counterclaim.

208. By reason of the foregoing, Plaintiff Morton is liable for Losses in the amount of $176,140.29, all of which are Mis-Certification Losses, plus attorneys' fees and costs of investigation.

209. Defendant's claims under this Ninth Counterclaim are Excluded Claims because the Losses arising therefrom relate to Plaintiff Morton's breaches of Section 2.33(b)(iv(B) of the SPA.

210. Losses arising from Excluded Claims are not subject to the Indemnification Cap nor the Threshold Amount set forth in Section 7.5 of the SPA.

211. Therefore, Plaintiffs' indemnification obligations with respect to the Losses described in this Ninth Counterclaim are not subject to the Indemnification Cap nor the Threshold Amount set forth in Section 7.5 of the SPA.

**WHEREFORE**, Defendant respectfully requests that the Court enter judgment as follows:

A. Dismissing Plaintiffs' claims with prejudice.

B. On Defendant's First Counterclaim, awarding damages in favor of Defendant, in an amount to be determined at trial, but in no event less than $212,268.85.

C. On Defendant's Second Counterclaim, awarding damages in favor of Defendant, in an amount to be determined at trial, but in no event less than $147,824.45.

D. On Defendant's Third Counterclaim, awarding damages in favor of Defendant, in an amount to be determined at trial, but in no event less than $7,471,567.76, which amount does not include the $212,268.85 demanded in the First Counterclaim and the $147,824.45 demanded in the Second Counterclaim.

E. On Defendant's Fourth Counterclaim, awarding damages in favor of Defendant, in an amount to be determined at trial, but in no event less than $1,354,106.77, and granting equitable relief with respect to the files deleted by Plaintiff Morton.

F. On Defendant's Fifth Counterclaim, awarding damages in favor of Defendant, in an amount to be determined at trial, but in no event less than $1,834.20.

G. On Defendant's Sixth Counterclaim, awarding damages in favor of Defendant, in an amount to be determined at trial.

H. On Defendant's Seventh Counterclaim, awarding damages in favor of Defendant, in an amount to be determined at trial, but in no event less than $281,061.89.

I. On Defendant's Eighth Counterclaim, awarding damages in favor of Defendant, in an amount to be determined at trial, but in no event less than $5,522.00.

J. On Defendant's Ninth Counterclaim, awarding damages in favor of Defendant, in an amount to be determined at trial, but in no event less than $176,140.29 plus any future remediation costs required.

K. Awarding Defendant its reasonable costs and fees, including attorneys' fees and costs of investigation.

L. Granting Defendant such other and further relief as the Court deems just and proper.

Date: January 24, 2025

Respectfully submitted,

**WHITEFORD, TAYLOR & PRESTON LLC**

*/s/ Daniel A. Griffith*
Daniel A. Griffith, Esq. (#4209)
600 North King Street
Suite 300
Wilmington, DE 19801
T: (302) 357-3254
F: (302) 357-3274
dgriffith@whitefordlaw.com

David S. Panzer, *pro hac vice forthcoming*
Eric S. Kronman, *pro hac vice forthcoming*
**FLUET & ASSOCIATES, PLLC**
1751 Pinnacle Drive
Suite 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
dpanzer@fluet.law
ekronman@fluet.law
e-file@fluet.law

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 24, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to counsel of record for all Parties.

*/s/ Daniel A. Griffith*
Daniel A. Griffith, Esq.(#4209)