IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHERRY MORTON and NATIONAL AEROBICS & FITNESS TRAINERS ASSOCIATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 24-1432-JLH-EGT |
| BCAP GDI 1, INC., | ) ) | |
| Defendant. | ) | |

## **MEMORANDUM ORDER**

Presently before the Court are the parties' motions to exclude certain expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). For the reasons set forth below, Plaintiffs' motion to exclude the testimony of Anthony Abbott (D.I. 80) is DENIED, Plaintiffs' motion to exclude the testimony of Kellie Fedkenheuer (D.I. 82) is DENIED and Defendant's motion to exclude certain testimony of Julia Alcarez (D.I. 78) is DENIED.[1]

## I.    **BACKGROUND**

Over three decades ago, Plaintiff Sherry Morton founded a health and fitness company called Millennium Health & Fitness, Inc. ("Millennium"). (D.I. 2 ¶ 8; D.I. 74, Ex. A at 12:2-14:19). On November 1, 2023, Ms. Morton and Defendant BCAP GDI 1, Inc. ("Defendant" or "BCAP") entered into a Stock Purchase Agreement, whereby Ms. Morton agreed to sell Millennium to BCAP. (D.I. 2 ¶ 1; D.I. 4 (Stock Purchase Agreement)). The same day, Plaintiff

---

[1]    The parties have consented to the undersigned's jurisdiction to conduct all pretrial proceedings and decide all pretrial motions pursuant to 28 U.S.C. § 636(c). (D.I. 18).

National Aerobics & Fitness Trainers Association ("NAFTA")[2] and BCAP entered into a separate agreement ("NAFTA Agreement"), whereby BCAP agreed to pay NAFTA $100,000 per year for at least 750 health and fitness trainings and certifications per year up until October 31, 2028. (D.I. 2 ¶ 16; D.I. 2, Ex. 2 (NAFTA Agreement)).  Per the agreement, NAFTA was obligated to perform its services in accordance with the "highest industry standards."  (*See* D.I. 2, Ex. 2 § 6.1(c)).

On December 31, 2024, Plaintiffs filed the present action, accusing BCAP of breaching the Stock Purchase Agreement by retaining a portion of the purchase price as an "Indemnity Holdback." (*See* D.I. 2 ¶¶ 12-15 & 24-39).  Plaintiffs also accuse BCAP of improperly terminating the NAFTA Agreement after one year (*id*. ¶¶ 19 & 40-45), alleging that BCAP "manufactured false allegations of 'cause' for termination and . . . unilaterally declared the NAFTA Agreement to have been terminated" (*id*. ¶ 43).  On January 24, 2025, BCAP filed its Answer and Counterclaims, alleging (among other things) that Ms. Morton breached the Stock Purchase Agreement by failing to deliver (and stealing) Millennium intellectual property (Counterclaim IV) and by failing to disclose a liability pertaining to Millennium and the U.S. Environmental Protection Agency ("EPA") (Counterclaim IX).  (*See* D.I. 12 at Counterclaims ¶¶ 69-111 (Counterclaim IV) & 188-211 (Counterclaim IX)).  According to BCAP, Ms. Morton had confidential Millenium files downloaded to an external hard drive and deleted from Millennium's system, thus depriving Millennium of information needed to successfully bid on three government contracts pertaining to health and fitness services for the Federal Bureau of Investigation ("FBI"),

---

[2]    NAFTA is a non-profit association that provides certifications to those involved in the health and fitness industry.  (D.I. 81 at 1).  Ms. Morton also founded NAFTA and owned it at all times relevant to the present action.  (D.I. 2, Ex. 2 § 9.2; *see also* D.I. 12 at Counterclaims ¶ 9; D.I. 17 ¶ 9).

U.S. Immigration and Customs Enforcement ("ICE") and the U.S. Marine Corps ("USMC").  (*Id.* at Counterclaims ¶ 95).

Discovery ensued and the parties retained various experts on liability and damages.  On February 27, 2026, Plaintiffs moved to exclude all testimony and opinions of Defendant's industry expert, Anthony Abbott (D.I. 80), and Defendant's damages expert, Kellie Fedkenheuer (D.I. 82).  That same day, BCAP moved to exclude certain opinions and testimony relating to causation and liability from Plaintiffs' rebuttal damages expert, Julia Alcarez.  (D.I. 78).  Briefing concluded for all three *Daubert* motions on March 20, 2026.  (D.I. 79, 81, 83 & 88-94).

## II.    **LEGAL STANDARD**

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.  As the Third Circuit has explained, Rule 702 has three requirements:  "(1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).

As to expert qualifications, an inquiry under Rule 702 must address whether the expert witness has "'specialized knowledge' regarding the area of testimony."  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)).  The basis of this specialized knowledge may be "practical experience as well as academic training

and credentials." *Id*. (cleaned up).  At a minimum, however, "a proffered expert witness . . . must possess skill or knowledge greater than the average layman." *Id*.  (cleaned up).  The Third Circuit tends to apply this standard liberally.  *Id*.; *see also Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

Regarding the second requirement (*i.e.*, reliability), Rule 702 mandates that the relevant expert testimony "must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) ("[A]n expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.").  The information provided by experts should be "ground[ed] in the methods and procedures of science" and be "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *see also Schneider*, 320 F.3d at 404; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (extending *Daubert* to all expert testimony, not just scientific expert testimony).  In examining this requirement, a court's focus must be on "principles and methodology" rather than on the conclusions generated by the expert.  *Daubert*, 509 U.S. at 595; *see also Daddio v. Nemours Found*, 399 F. App'x 711, 713 (3d Cir. 2010).

As to the third requirement under Rule 702, the Third Circuit has explained that the expert testimony must "fit" under the facts of the case such that the expert testimony "will aid the jury in resolving a factual dispute." *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (citation omitted).  This factor is satisfied "when there is a clear 'fit' connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case." *Id.* (citation omitted); *see also Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

"Rule 702 embodies a 'liberal policy of admissibility.'" *B. Braun Melsungen AG v. Terumo Med. Corp.*, 749 F. Supp. 2d 210, 222 (D. Del. 2010) (quoting *Pineda*, 520 F.3d at 243). That being said, the party seeking to offer expert testimony must show – by a preponderance of the evidence – that the proposed testimony satisfies each of the standards for admissibility under Rule 702. *Id.* (citing *Daubert*, 509 U.S. at 592 n.10).

## III.   DISCUSSION

### A.   Plaintiffs' Motion to Exclude Testimony of Anthony Abbott (D.I. 80)

To rebut Plaintiffs' claim that BCAP wrongfully terminated the NAFTA Agreement, BCAP retained Dr. Anthony Abbott to opine on the quality of services provided by NAFTA. (*See generally* D.I. 81, Exs. 3 & 7). Dr. Abbott holds a doctorate in exercise science and physiology and has over forty-five years of experience as a physical fitness instructor, personal trainer and facility manager. (D.I. 81, Ex. 3 at 1). Among other accolades, Dr. Abbott developed the first nationally accredited personal trainer certification with the National Strength & Conditioning Association. (*Id.*). Highlighting several allegedly insufficient aspects of NAFTA's training programs (including lack of accreditation and short timeframe), Dr. Abbott ultimately opines that NAFTA failed to provide services according to the "highest industry standards" as required by the parties' agreement. (*See id.* at 4; D.I. 81, Ex. 7).

Plaintiffs argue that Dr. Abbott's testimony should be excluded as unreliable because he relies purely on improper *ipse dixit* in rendering his opinions on the quality of NAFTA's trainings and certifications. (D.I. 81 at 9-11; D.I. 94 at 4-8). Emphasizing his failure to review NAFTA's certification exams, Plaintiffs argue that Dr. Abbott failed to review sufficient NAFTA materials to offer an informed opinion. In BCAP's view, NAFTA is a "pay-to-play, flight-by-night" fictional association "created by Plaintiff Sherry Morton," and Dr. Abbott is allowed to rely on his

5

experience in rendering his opinions.  (D.I. 88 at 1 & 8-11).  BCAP also insists that Dr. Abbott sufficiently researched NAFTA's training programs to render a reliable and informed opinion as to their quality.  (D.I. 88 at 8-15).  The Court ultimately agrees with BCAP that Dr. Abbott's proffered testimony meets the reliability requirement.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  "*Daubert* explains that the language of Rule 702 requiring the expert to testify to scientific knowledge means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief."  *Paoli*, 35 F.3d at 742 (emphasis omitted) (quoting *Daubert*, 509 U.S. at 590)); *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) ("Noettl's *ipse dixit* does not withstand *Daubert*'s scrutiny.").

Dr. Abbott's opinions are more than *ipse dixit*; he appears to have sufficiently investigated NAFTA's training programs to be able to render an opinion as to the quality of those programs. He reviewed NAFTA advertisements as well as the accreditation status, length of time entailed, course materials and in-person requirements of NAFTA certification courses.  (*See generally* D.I. 81, Exs. 3 & 7).  Dr. Abbott also reviewed and responded to the rebuttal report of Plaintiffs' expert, Matthew C. Kostek,[3] which provided further information regarding NAFTA certification programs.  (*See* D.I. 81, Ex. 5).  That Dr. Abbott did not take or review a NAFTA certification exam does not mean that his opinions are based purely on *ipse dixit*.

---

[3]    BCAP does not seek to exclude Mr. Kostek's testimony, who opines that "NAFTA certifications meet or exceed [the] fitness industry's highest standards."  (*See generally* D.I. 81, Ex. 5).

6

Plaintiffs cite a number of cases to support exclusion (D.I. 81 at 8-9), but those cases are all distinguishable.  In *M2M Solutions LLC v. Enfora, Inc.*, the expert offered "loose, vague allegations" of comparability that failed to provide "a basis to meaningfully assess technological comparability."  167 F. Supp. 3d 665, 677-78 (D. Del. 2016).  And in *Qorvo, Inc. v. Akoustis Technologies, Inc.*, the expert provided "almost no basis for how he arrived" at his opinions "without citation to specific examples or analysis under any analytical framework or method."  C.A. No. 21-1417-JPM, 2024 WL 5334984, at *3 (D. Del. Apr. 25, 2024) (citation omitted).  Here, Dr. Abbott here provided sufficiently "good grounds" for comparing NAFTA's training programs with other training programs in the same field – particularly by comparing the specifics of various training programs offered.  (*See, e.g.*, D.I. 81, Ex. 7 at 2-3 (Dr. Abbott comparing NAFTA's four-day training program with ten-week, sixty-hour training programs offered by competitors)).

Plaintiffs take issue with the fact that Dr. Abbott did not review certain NAFTA training materials until the day before his deposition (D.I. 81 at 11; D.I. 94 at 8-10), but that complaint is beyond the reach of a proper *Daubert* motion.  *See Stirista, LLC v. Skydeo Inc.*, C.A. No. 23-856-CFC, 2025 WL 825288, at *1 (D. Del. Mar. 14, 2025) (distinguishing between motions to strike and *Daubert* motions to exclude); *McCoy v. GEICO Indem. Co.*, No. 20-5597 (ZNQ) (TJB), 2023 WL 2929454, at *7 (D.N.J. Apr. 13, 2023) (same).  Because Dr. Abbott's opinion on the quality of NAFTA's services is supported by sufficiently "good grounds" to be reliable, Plaintiffs' motion to exclude Dr. Abbott's testimony will be denied.

**B.     Plaintiffs' Motion to Exclude Testimony of Kellie Fedkenheuer (D.I. 82)**

To quantify damages from Counterclaims IV and IX, BCAP retained Kellie Fedkenheuer, a Certified Public Accountant with over fifteen years of forensic accounting experience.  (*See* D.I. 83, Exs. 1 & 2).  In her opening report, Ms. Fedkenheuer indicates that she assumed liability

7

for Counterclaims IV and IX and that she was not offering an opinion on whether Millennium would have obtained the FBI, ICE and USMC government contracts had Ms. Morton not allegedly deleted the confidential Millenium files.  (*See* D.I. 83, Ex. 1 at 3-4).  To estimate lost profits damages for the three lost government contracts, Ms. Fedkenheuer identified "three ongoing contracts in 2024 and 2025 that had a size and/or scope that was similar to those of the FBI, ICE and USMC awards."  (D.I. 83, Ex. 1 at 10-12).  And for future lost profits damages, she applied a discount rate of 9% based, at least in part, on Delaware's usury statute, 6 *Del. C.* § 2301(a). (D.I. 83, Ex. 2 at 15 ("[T]he rate used to discount future lost profits includes the Federal Reserve discount rate of 4 percent, which represents the risk-free rate of return, and an additional 5 percent, which accounts for the risks above the risk-free rate.")).

Plaintiffs seek to exclude all of Ms. Fedkenheuer's testimony, arguing that her (1) discount rate analysis and (2) gross profit margin determination should be excluded as unreliable and, further, that her (3) factual narratives for Counterclaims IV and IX and (4) damages calculation for Counterclaim IX should be excluded as failing to meet the "fit" requirement.  The Court addresses these grounds for exclusion in turn.

     1.     <u>Discount Rate Analysis</u>

Plaintiffs vehemently dispute the propriety of the 9% discount rate Ms. Fedkenheuer used for future lost profits.  (D.I. 83 at 7-14; D.I. 93 at 1-6; *see also* D.I. 83, Ex. 2 at 15).[4]  In Plaintiffs' view, this discount rate should be excluded as unreliable because Ms. Fedkenheuer arbitrarily

---

[4]    Courts apply discount rates to future lost profits damages to account for the "time value of money" and adjust the "value of the cash flow stream to account for risk."  *See Energy Cap. Corp. v. United States*, 302 F.3d 1314, 1333 (Fed. Cir. 2002); (*see also* D.I. 83, Ex. 4 at 62-63 (explaining that future lost profits are discounted to present value because "the harmed party typically receives a monetary award that is deemed due as of a judgment date, when that judgment date precedes the date or dates on which the profits in question would have been earned and cash received")).

selected the rate based on Delaware's usury statute, which provides that pre-judgment interest will be "5% over the Federal Reserve discount rate." (*See* D.I. 83 at 10 ("Apart from its divergent subject matter, the statute provides for interest on **past** losses incurred up to the judgment date, not into the future." (emphasis in original)); D.I. 93 at 1-6).[5] BCAP responds that Ms. Fedkenheuer's discount rate analysis is sufficiently reliable because (among other reasons) "the Delaware rate is simply the going federal discount rate plus 5% attributable risk." (D.I. 89 at 13 ("Plaintiffs' fixation on the definition of 'prejudgment interest' misses the significance of the component parts in Delaware's rate.")).

The Court begins by noting that, when prompted with similar disputes at the *Daubert* stage, a number of other district courts have emphasized the inherent subjectivity in selecting a discount rate and found that "discount rate issues should be left for cross-examination and competing expert testimony." *Mareiners, LLC v. Anomatic Corp.*, No. 2:22-CV-3433, 2025 WL 4480365, at *6 (S.D. Ohio Dec. 30, 2025); *see also Silipena v. Am. Pulverizer Co.*, No. CV 16-711, 2024 WL 3219226, at *20 (D.N.J. June 28, 2024); *Hill v. Century Arms, Inc.*, No. 3:21-CV-31-TAV-DCP, 2023 WL 7431143, at *4 (E.D. Tenn. Nov. 9, 2023); *Hutchens v. Abbott Lab'ys, Inc.*, No. 1:14CV176, 2016 WL 10566144, at *4-5 (N.D. Ohio Dec. 22, 2016); *Jerome v. Watersports Adventure Rentals & Equip., Inc.*, No. CV 2009-092, 2013 WL 3663059, at *13-14 (D.V.I. July 11, 2013); *Swierczynski v. Arnold Foods Co.*, 265 F. Supp. 2d 802, 809-10 (E.D. Mich. 2003).

The Court agrees with BCAP that Ms. Fedkenheuer's discount rate analysis is based on sufficiently "good grounds" to meet the reliability requirement. *See Swierczynski*, 265 F. Supp. 2d at 809-10 (declining to exclude expert's discount rate analysis "derived from an objective,

---

[5]   The Federal Reserve discount rate was 4% when BCAP served her opening expert report. (*See* D.I. 83, Ex. 1 at 21).

independent, and well-established source, (i.e., the return rate for ten-year treasury bills)").[6]

Contrary to Plaintiffs' contention that she conducted no analysis of risks "specific to Millenium" (D.I. 83 at 12), Ms. Fedkenheuer considered Millenium's Weighted Average Cost of Capital (WACC) and Weighted Average Cost of Debt (WACD) in determining that the 9% rate was appropriate (D.I. 83, Ex. 2 at 16-17). For the same reasons, the Court is also unpersuaded that Ms. Fedkenheuer "applied no methodology" in selecting the rate and acted merely as a mouthpiece for Defendant's attorneys. (D.I. 83 at 11). Ultimately, Ms. Fedkenheuer's discount rate analysis is sufficiently reliable to be admissible. As noted by many other district courts dealing with similar discount rate issues, Plaintiffs' criticisms are better suited for cross-examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### 2. Gross Profit Margin

Plaintiffs next argue that Ms. Fedkenheuer's gross profit margin determination should be excluded as unreliable because, in selecting comparable contracts to the lost bids, she purportedly relied solely on her conversations with BCAP Vice President and Millennium Operating Partner Jeffrey Eagan. (D.I. 83 at 14-16; D.I. 93 at 6-8). In response, BCAP argues that Ms. Fedkenheuer permissibly gathered data from conversations with BCAP's employees. (D.I. 89 at 14-17). BCAP also points out that Ms. Fedkenheuer conducted more investigation than merely speaking with Mr. Eagan – *e.g.*, she reviewed Millenium's general ledger, profit and loss statements and company-specific margins in past contracts. (*Id.*). The Court ultimately agrees with BCAP that Ms.

---

[6]     To be clear, the Court is not deciding whether Ms. Fedkenheuer was correct in relying on the Delaware usury statute. Instead, the Court only concludes that her methodology is sufficiently reliable to be admissible. *See Paoli*, 35 F.3d at 744-45.

Fedkenheuer's gross profit margin opinion is based on more than personal conversations with Mr. Eagan.

As evidenced by her expert report and deposition testimony, Ms. Fedkenheuer's methodology in selecting comparable contracts was sufficiently reliable and did not, as Plaintiffs contend, "blind[ly] adhere[]" to data provided by Mr. Eagan "absent any sort of independent investigation." (D.I. 93 at 1-2 (quoting *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 137 (M.D. Pa. 2015))). For example, in her opening report, Ms. Fedkenheuer explained:

> To properly adjust our lost profits calculation for costs that [Millenium] avoided by not generating the lost revenues, we applied a gross profit margin to the lost revenues. . . . We first reviewed [Millenium]'s financial information to determine its gross profit margin percentages in 2024 and 2025 for contracts that were similar to the FBI, ICE and USMC awards (i.e., similar in size and/or scope). Specially, we reviewed [Millenium]'s general ledger detail and profit and loss by customer reports for 2024 and the available portions of 2025, which we obtained from [Millenium]'s accounting system. We used these financial reports – in addition to information we obtained from conversations with [Millenium] – to identify similar contracts.

(D.I 83, Ex. 1 at 10-11; *see also* D.I. 83, Ex. 5 at 154:22-156:2).[7] In other words, Ms. Fedkenheuer did more than merely speak with Mr. Eagan to identify comparable contracts. She analyzed information regarding Millennium's historical contracts (*e.g.*, revenue) to identify contracts that she deemed comparable to the lost bids.

Despite Plaintiffs' claim to the contrary (D.I. 83 at 14-15), that Ms. Fedkenheuer did not review the underlying contracts themselves does not render her opinions as to comparable contracts unreliable. Ms. Fedkenheuer compared several aspects – including "the size of the

---

[7]    Similarly, during her deposition, Ms. Fedkenheuer explained that "the size of the revenue, the scope of services, and our understanding from Jeff Eagan when we had determined that these looked comparable, and he agreed that these would be comparable contracts, was our basis for determining which contracts to use as comparable contracts when applying gross margin to lost revenues." (D.I. 83, Ex. 5 at 154:22-156:2).

revenue" and "the scope of services" – to identify comparable contracts.  (D.I. 83, Ex. 5 at 154:22-156:2).  And her partial reliance on conversations with Mr. Eagan does not render her opinions unreliable.  *See Azer Sci. Inc. v. Quidel Corp.*, No. 5:21-CV-02972-JMG, 2022 WL 23031241, at *1 n.1 (E.D. Pa. Nov. 21, 2022) ("The Court is not persuaded Ms. Flanagan's lost profits calculation is unreliable because it incorporates a revenue provided by Defendant's officers.").  Indeed, Rule 703 expressly permits this.  *See* FED. R. EVID. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.").  BCAP has shown that Ms. Fedkenheuer's gross profit methodology is based on sufficiently "good grounds" to meet the "not that high" reliability requirement.  *See Paoli*, 35 F.3d at 745.  Plaintiffs' criticisms are better reserved for cross-examination.  *See Daubert*, 509 U.S. at 596.

3.    Factual Narrative Underlying Counterclaims IV and IX

Plaintiffs argue that Ms. Fedkenheuer's factual narratives of Counterclaims IV and IX are an inappropriate rehashing of BCAP's theory of the case that will not assist the trier of fact.  (D.I. 83 at 16-18 (citing D.I. 83, Ex. 1 at 7-9 & 17-18); D.I. 93 at 8-9).  BCAP insists that Ms. Fedkenheuer simply identified factual assumptions underlying her opinions and that the Court is capable of parsing between those factual assumptions and expert opinions.  (D.I. 89 at 17-19).

If this case were proceeding to a jury trial, the Court would likely agree that several statements in Ms. Fedkenheuer's expert report venture "into areas in which the jury needs no aid or illumination."  *United States v. Gibbs*, 190 F.3d 188, 212 (3d Cir. 1999); *see also Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-CV-681 KBF, 2015 WL 5459662, at *3 (S.D.N.Y. Sept. 16, 2015) ("Mere narration thus fails to fulfill *Daubert*'s most basic requirements.").  For example, with respect to Counterclaim IV, Ms. Fedkenheuer states that the allegedly deleted files "distracted [Millenium] personnel from their normal duties and hindered

12

[Millenium]'s ability to succeed in bidding on contracts after the closing" of the Stock Purchase Agreement. (D.I. 83, Ex. 1 at 7). Similarly, with respect to Counterclaim IX, Ms. Fedkenheuer states that Millenium "represented" to the EPA "that it was not receiving the collections and that, as the account was closed, 'any attempt to deposit funds would be restricted/kicked back.'" (*Id*. at 16 (quoting D.I. 12 at Counterclaims ¶ 198)). Such statements are unnecessary and unhelpful for a damages opinion and would risk confusing a jury.

That being said, the concerns underlying Federal Rule of Evidence 403, such as confusion and unfair prejudice, are minimal where, as here, the case proceeds via bench trial. *See Belcher Pharms., LLC v. Hospira, Inc.*, C.A. No. 17-775-LPS, 2019 WL 2425979, at *1 (D. Del. May 31, 2019); *see also APEX Fin. Options, LLC v. Gilbertson*, C.A. No. 19-0046-WCB-SRF, 2022 WL 622130, at *1 (D. Del. Mar. 3, 2022) ("Courts in this district have consistently exercised restraint in applying Rule 403 in a bench trial 'because the Court is capable of assessing the probative value of the [evidence] and excluding any arguably improper inferences.'" (alteration in original) (citation omitted)). Therefore, the Court will not exclude Ms. Fedkenheuer's factual narratives underlying Counterclaims IV and IX because they are limited and provide context to her opinions. See *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833 (3d Cir. 2020) (court may conditionally admit expert testimony subject to a later Rule 702 determination).

### 4. Calculation of Damages Underlying Counterclaim IX

Finally, Plaintiffs argue that Ms. Fedkenheuer's calculation of damages underlying Counterclaim IX amounts to "mere arithmetic" and is therefore "outside the remit of an economic damages expert and would not assist the trier of fact." (D.I. 83 at 18-19; D.I. 89 at 9-10). BCAP maintains that Ms. Fedkenheuer's calculation of damages for Counterclaim IX "is a product of

13

[her] expert analysis and will assist the Court as factfinder." (D.I. 89 at 19-20 (citing *Total Control, Inc. v. Danaher Corp.*, 338 F. Supp. 2d 566 (E.D. Pa. 2004))).

Ms. Fedkenheuer's damages calculations with respect to Counterclaim IX consist of merely adding collections received from EPA personnel to costs allegedly incurred by BCAP as a result. (*See* D.I. 83, Ex. 1 at 17-21). And BCAP does not seriously dispute that Ms. Fedkenheuer's calculation of damages for Counterclaim IX constitutes "mere arithmetic." (D.I. 89 at 19-20). The Court, as fact finder, is "more than capable of adding the specific costs associated with" the alleged damages with respect to Counterclaim IX "that will be offered by Plaintiff[s] through [their] fact witnesses." *AgroFresh Inc. v. Essentiv LLC*, C.A. No. 16-662 (MN), 2019 WL 9514565, at *1-2 (D. Del. Oct. 7, 2019) (excluding damages expert testimony that "consists solely of adding numbers detached from the actual trade secret issues"). But considering this is a bench trial, the testimony will be conditionally admitted subject to a later Rule 702 determination by the trial judge. *See UGI Sunbury*, 949 F.3d at 833.

Accordingly, the Court will deny Plaintiffs' motion to exclude the testimony of Kellie Fedkenheuer.

### C. Defendant's Motion to Exclude Testimony of Julia Alcarez (D.I. 78)

Plaintiffs retained Julia Alcarez to serve as a rebuttal expert to Ms. Fedkenheuer. Ms. Alcarez is a Certified Public Accountant with over fifteen years of experience working on government contract and forensic accounting matters. (*See* D.I. 79, Ex. B ¶ 3). Despite Ms. Fedkenheuer stating that she was not opining on liability (*see* D.I. 83, Ex. 1 at 3-4), Ms. Alcarez attacks Ms. Fedkenheuer's assumption that the allegedly missing Millenium documents caused Millennium to lose the three government contracts with FBI, ICE and USMC.

14

(*See* D.I. 79, Ex. B ¶ 8).[8]  In addition to offering causation opinions, Ms. Alcarez also asserts that Fedkenheuer's "lost profit calculation is unsupported and overstated for multiple reasons, including overstatement of lost revenues, overstatement of profit margin, and application of an unsubstantiated discount rate that ignores known areas of risk." (*Id*. ¶ 9).

BCAP seeks to exclude Ms. Alcarez's damages opinions with respect to causation because she (1) is purportedly unqualified to testify regarding causation, (2) offers impermissible legal conclusions and (3) offers improper rebuttal testimony outside the scope of Ms. Fedkenheuer's affirmative expert report. (*See generally* D.I. 79 & 92).  The Court addresses each ground in turn.

### 1.    Qualification

BCAP first argues that Ms. Alcarez is not qualified to opine on causation with respect to Counterclaim IV.  (D.I. 79 at 9-12; D.I. 92 at 8-10).  BCAP takes great pains to highlight her apparent lack of experience serving as a contracting officer.  (D.I. 79 at 11 ("Her experience in this area is so lacking that she had not even heard of the 'Pwin' concept – an industry-standard term for the very issue she purported to analyze (*i.e.*, the likelihood of winning a contract).")).  But BCAP overlooks the fact that Ms. Alcarez has worked on government procurement matters for sixteen years.  (D.I. 79, Ex. C at 13:3-11).  Indeed, according to her CV, she has experience with "preparation, review, analysis, and testimony related to claims submitted by contractors to US Government agencies."  (D.I. 79, Ex. D at 2).  She testified that she has "extensive" experience with the government's evaluation of contractor proposals.  (D.I. 79, Ex. C at 16:1-12).  And she

---

[8]    Relying on Federal Acquisition Regulations and other documents, Ms. Alcarez opines that "[p]rice was the least important factor in the FBI, ICE, and USMC procurements, Ms. Fedkenheuer has not established that the historical proposal documents would have decreased MHF's proposed price, and Ms. Fedkenheuer has not established that a lower (or lowest) price would result in a more competitive proposal, nor that a lower (or lowest) price would result in contract award." (*See* D.I. 79, Ex. B ¶ 8).

has also apparently "worked on dozens of bid protests where the Government explains why a contract was awarded to one offeror and not another." (D.I. 79, Ex. B ¶ 28).

The Court is ultimately unpersuaded that Ms. Alcarez's lack of experience serving as a contracting officer warrants exclusion of her causation opinions. *See Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996) ("Because of our liberal approach to admitting expert testimony, most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony than to its admissibility."); *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 856 (3d Cir. 1990) (holding that district court abused its discretion in excluding experts because they "did not have the degree or training which the district court apparently thought would be most appropriate"). Instead, the Court agrees with Plaintiffs that Ms. Alcarez's accounting experience in government procurement matters sufficiently qualifies her to opine on causation with respect to Counterclaim IV. (D.I. 90 at 16-17). BCAP's criticisms of Ms. Alcarez's qualifications are more appropriately taken up during cross-examination at trial. *See Daubert*, 509 U.S. at 596.

### 2.    Legal Conclusions

BCAP next argues that Ms. Alcarez's causation opinions should be excluded because they constitute inadmissible legal conclusions regarding the Federal Acquisition Regulations ("FAR"). (D.I. 79 at 13-14; D.I. 92 at 8-10). Plaintiffs dispute this characterization, arguing that the opinions are based "largely on the plain terms of the solicitations, which is far different than interpreting the legal requirements of the FAR." (D.I. 90 at 14-16).

"Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006); *see also United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) ("The 'expert' would

have testified about the meaning of the statute and regulations. That's a subject for the court, not for testimonial experts."); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").

In Paragraphs 18-28 of her rebuttal expert report, Ms. Alcarez provides a detailed summary and interpretation of Federal Acquisition Regulations. (*See* D.I. 79, Ex. B at ¶¶ 18-28 (citing 48 C.F.R. §§ 12.203, 15.101-1, 15.305 & 15.404-1)). For example, she explains that "[u]nder FAR Part 12, Acquisition of Commercial Products and Commercial Services, the Government may use different source selection methods as appropriate for the selection." (*Id*. ¶ 20 (citing 48 C.F.R. § 12.203)). This summary of the relevant regulations and analysis as to their meaning (D.I. 79, Ex. B at ¶¶ 18-28) appears to constitute impermissible legal conclusions. *See Info. Sys. & Networks Corp. v. United States*, 136 Fed. Cl. 34, 36 (2018) ("Expert testimony on issues of law are not admissible for the purposes of proving that the government's interpretation of the Cost Accounting Standards ('CAS') and Federal Acquisition Regulations ('FAR') are not correct."); *U.S. ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94, 98 (D.D.C. 2002) (excluding expert testimony that "lifts language directly from the Federal Acquisition Regulations ('FAR') to explain his conclusion that the PaL-Tech contract with PHNC was not a personal services contract"). But again, this case is proceeding to a bench trial. The presiding judge is more than capable of parsing the causation opinions offered at trial and excluding any improper legal opinions as appropriate. *See UGI Sunbury*, 949 F.3d at 833.

### 3. Improper Rebuttal Testimony

BCAP also argues that Ms. Alcarez's causation opinions should be excluded as improper rebuttal testimony that exceeds the scope of BCAP's opening reports. (*See* D.I. 79 at 14-20). This

17

argument is one that belongs in a motion to strike under Rule 37 – not in a *Daubert* motion. *See, e.g., Dzielak v. Whirlpool Corp.*, No. CV 2:12-0089 (KM)(JBC), 2017 WL 1034197, at *30 (D.N.J. Mar. 17, 2017) ("The plaintiffs' motion to strike pursuant to Rule 37(c)(1), however, is not a *Daubert* motion. It is a discovery motion that should have been discussed if not resolved by the parties, with or without the help of the Magistrate Judge, months ago."). The Court will not address issues regarding expert testimony that should have been raised elsewhere.[9]

In sum, BCAP's motion to exclude the testimony of Julia Alcarez will be denied.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion to exclude the testimony of Anthony Abbott (D.I. 80) is DENIED, Plaintiffs' motion to exclude the testimony of Kellie Fedkenheuer (D.I. 82) is DENIED and Defendant's motion to exclude certain testimony of Julia Alcarez (D.I. 78) is DENIED.

Dated: July 16, 2026

_____
UNITED STATES MAGISTRATE JUDGE

---

[9]    Even if BCAP raised the scope issue in a separate motion to strike using the proper procedure for doing so (*see* D.I. 28 ¶¶ 7(g) & 8(a)), such a motion would have likely been untimely. Plaintiffs served Ms. Alcarez's expert report on December 1, 2025. (*See* D.I. 79, Ex. B). Instead of moving to strike via the undersigned's procedures around that time, BCAP waited almost three months to complain about Ms. Alcarez's rebuttal testimony in a *Daubert* motion. And any motion now would be even further untimely. Moreover, given the importance of causation to BCAP's Counterclaim IV (and Plaintiffs' defense to it), the minimal evidence of bad faith by Plaintiffs, and BCAP's opportunity to cure any alleged prejudice by deposing Ms. Alcarez and responding to Ms. Alcarez's causation opinions in Ms. Fedkenheuer's reply expert report (which BCAP apparently opted against), BCAP would be unlikely to demonstrate that the *Pennypack* factors warrant the "extreme" sanction of excluding Ms. Alcarez's causation opinions. *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977), *overruled on other grounds by Goodman v. Lukens Steel Co.*, 777 F.2d 133 (3d Cir. 1985).