# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

SHERRY MORTON and
NATIONAL AEROBICS & FITNESS
TRAINERS ASSOCIATION,

          Plaintiffs,

v.

          Civil Action No.: 1:24-cv-01432-JLH

BCAP GDI 1, INC.,

          Defendant.

**JOINT STATEMENT OF UNCONTESTED FACTS**

1.      Plaintiff Morton is an individual and a citizen of Texas. Morton was a citizen of Arizona at the time Plaintiffs filed this action.

2.      Plaintiff NAFTA[1] is organized as an Arizona non-profit association managed by Plaintiff Morton.

3.      Defendant BCAP GDI 1, Inc. ("BCAP") is a Delaware corporation with its principal place of business in Virginia. Thus, BCAP is a citizen of both Delaware and Virginia.

4.      In 2022, a BCAP affiliate and Plaintiff Morton conducted negotiations for the potential purchase of Millennium Health & Fitness, Inc. ("Millennium" or "MHF") by such affiliate. No transaction occurred as a result of that round of negotiations.

5.      On August 19, 2023, the parties entered into a letter of intent (DTX-39) with regard to the potential purchase of Millennium by BCAP.

6.      In 2023, the parties were able to reach an agreement for BCAP to purchase the stock of Millennium, formalized in a Stock Purchase Agreement ("SPA") (JTX-07), which was

---

[1] All terms capitalized but not defined herein shall have the definitions ascribed to them in the Proposed Final Pre-Trial Order.

1

ultimately signed on November 1, 2023. The transaction also closed on November 1, 2023. As part of the transaction, the parties entered multiple related contracts, including:

    a. A Side Letter Agreement (JTX-10), whereby Morton agreed to pay legal fees incurred after Closing in connection with two specific ongoing matters.

    b. A Consultant Agreement (JTX-09), whereby Morton agreed to "work alongside and in coordination with other [Millennium] personnel to provide advice and expertise in connection with directing and ensuring a productive transition of the operations of the Company related to fitness and wellness training and the relationships related thereto."

    c. An Equityholder Restrictive Covenant Agreement (JTX-11), whereby Morton agreed to, among other things, certain confidentiality, non-competition, and non-solicitation requirements.

    d. An Independent Contractor Agreement (the "NAFTA Agreement") (JTX-08), whereby NAFTA agreed to provide specified services (including fitness training and certification services) to BCAP and Millennium "in accordance with the highest industry standards for similar services."

7.    No party disputes that the SPA and the associated contracts are valid, binding contracts between Morton, BCAP, and NAFTA (where applicable).

8.    Describing the transaction at Section 1.1(a), the SPA stated, "In full payment for the Acquired Shares and in consideration of the Seller's representations, warranties, covenants and agreements in this Agreement and the other Transaction Documents, the Buyer will pay, or cause to be paid, the cash portion of the Purchase Price to the Seller in the manner described in Section l.3(b) and Section 1.5."

9.      Under Section 1.1(b) of the SPA, BCAP agreed to pay to Morton the stated "Base Purchase Price," subject to certain expenses and potential adjustment amounts, referenced at Section 1.2 as the "Indemnity Holdback" and "Escrow Amount."

10.     The Base Purchase Price under the SPA was $10,000,000.00, plus the "September Accounts Receivable" (defined as "the balance of outstanding billed accounts receivable for work performed between September 1, 2023 and September 30, 2023").

### *The SPA's Indemnification and Claims Provisions*

11.     At closing, BCAP retained $500,000 of the purchase price as the Indemnity Holdback, which was intended to be available to cover any Losses resulting from certain types of contractual breaches discovered after the Closing.  Section 7.9 of the SPA authorized BCAP to use the Indemnity Holdback "in its sole discretion to remunerate [BCAP] for" indemnified Losses. The SPA defined "Loss" as "any loss, damage, due, penalty, fine, interest, cost, amount paid in settlement, judgment, Liability, Tax, Lien (other than Permitted Liens), cost of investigation, expense and fee (including court costs and attorneys' or other professionals' fees and expenses paid or incurred); provided that Losses shall only include, punitive, exemplary or special damages to the extent such damages are awarded pursuant to a third party claim. For the avoidance of doubt, 'Mis-Certification Losses' shall be included in the definition of 'Loss.'" *See* Ex. A to SPA.

12.     An additional $500,000 of the purchase price was placed in escrow in the event it was necessary to pay for "Mis-certification Losses," defined in Section 7.3(f) of the SPA as "any Losses, claw backs by a customer, (as reasonably determined by the Buyer) relating to any Contracts disclosed by the Company or Seller under Schedule 2.33(b)(ii) or Schedule 2.33(b)(iv)(B) [to which Plaintiff Morton disclosed six bids from 2022 where the Company

3

inadvertently mis-certified its size, but no other disclosures were made] or relating to any inaccuracy or any breach of Section 2.33(b)(ii) or Section 2.33(b)(iv)(B) of this Agreement."

13.     SPA § 2.33(b)(ii) contained the representation by Plaintiff Morton (as seller) that "[w]ith respect to each Government Contract which is listed on Schedule 2.33(a), to the Knowledge of the Company, there are no facts and circumstances that indicate that, and to the Knowledge of the Company, no Person has informed any Company Party that, the applicable Governmental Authority or higher tier contractor shall terminate, reduce expenditures under or fail to exercise options included in the Government Contract following size recertification or consummation of the transactions contemplated in connection with this Agreement and the Transaction Documents."

14.     SPA § 2.33(b)(iv)(B) contained the representation by Plaintiff Morton (as seller) that "Each Company Party has complied in all material respects with all Applicable Laws pertaining to each Government Contract, Government Vendor Subcontract, Teaming Agreement or Government Bid, including the following Laws to the extent applicable: the False Claims Act, the Contract Disputes Act, the Procurement Integrity Act, the Truthful Cost or Pricing Data Act, the Service Contract Act, the Office of Federal Procurement Policy Act, the Federal Property and Administrative Services Act, the FAR, the FAR Supplements, the SBA Regulations, the Cost Accounting Standards, or any other Applicable Law. To the Knowledge of the Company, and except as disclosed on Schedule 2.33(b)(ii), no event has occurred which, with the passage of time or the giving of notice or both, would result in a material violation of any Applicable Law."  The definition of Applicable Law means "a Law applicable to such [entity or person] or any of its properties, assets, officers, directors, managers, employees, consultants or agents (in connection with such officer's, director's, manager's, employee's, consultant's or agent's activities on behalf

4

of such [entity or person]).”  The definition of Law means “any federal, state, local, municipal, foreign or other law, statute, legislation, principle of common law, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, directive, requirement, writ, injunction, settlement, Permit or Order that is or has been issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Authority.”  And, the definition of Governmental Authority means “any federal, state, local, foreign or other governmental, quasi-governmental or administrative body, instrumentality, department or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.”  The term “Governmental Authority” includes any Person acting on behalf of a Governmental Authority.”

15.  SPA § 7.5(a) imposes potential limits on the Seller’s indemnity obligations, stating, “Except as otherwise expressly provided in this Agreement, the maximum aggregate amount of indemnification payments for which the Seller will have liability to the Buyer Parties under Section 7.2(a), other than with respect to applicable Excluded Claims, will not exceed $750,000.”  To see what is not subject to the $750,000 cap, Excluded Claims is defined as “any Claim by a Buyer Party (a) under Section 7.2(b) and Section 7.3, (b) for inaccuracies or breaches of any Fundamental Representation or Government Contracts Matters Representation, or (c) for Fraud-Type Claims.”  Section 7.2(b) includes “any and all Losses that are incurred by [the Buyer Parties] based upon, arising out of or otherwise in respect of … the non-fulfillment or breach by or on behalf of the Seller or, at or prior to the Closing, the Company, of any unwaived covenant (for the sake of clarity, only covenants, and not representations or warranties), obligation or agreement, in each case, as contained in this Agreement, any Transaction Document, or in any statement or certificate delivered pursuant to Section 6.1[.]”  Transaction Documents is defined as “[the SPA] and each

5

agreement, instrument or document attached hereto as an Exhibit, and the other agreements, certificates and instruments to be executed or delivered by any of the parties in connection with or pursuant to this Agreement."  Section 7.3, titled "Supplemental Indemnification" includes indemnifications by Plaintiff Morton of the Buyer Parties for, among other things, "any underestimation of the Seller Expenses or the amount of Debt set forth in the Flow of Funds Memorandum, … any Fraud-Type Claims, … any breach of a covenant by the Seller under Section 5 [relating to confidentiality, IP, and the NAFTA Agreement], … [and] Mis-Certification Losses" (as defined above).  Fraud-Type Claims is defined as "actual fraud that is committed by a party arising out of or in connection with the making of representations and warranties by such party in" the SPA or any "***Transactional Document.***"

16.     Defendant was to pay half of the Indemnity Holdback to Morton within three business days of the 12-month anniversary of Closing, subject to any Losses that were (i) settled between the parties during the prior year or (ii) identified through a written notice before the 12-month anniversary of the Closing.  The final date of this first holdback period was November 6, 2024.  The balance of the Indemnity Holdback was to be paid to Morton within three business days of the 2-year anniversary of the Closing, subject to similar conditions. November 5, 2025, was the final date of this remaining holdback period.

17.     However, Section 7.13 of the SPA allowed BCAP to withhold a portion of the Indemnity Holdback equal to "Losses stated in any notice of claim for indemnification delivered by the Buyer…on or prior to the twelve (12) month anniversary of the Closing Date that remain unsettled or disputed."  Section 7.7 of the of the SPA requires that any non-third party claim "be asserted by a written notice [identifying such claim as] a "DIRECT INDEMNITY CLAIM NOTICE." Section 7.4 of the SPA stated that any representations and warranties made under

6

Section 2 would only survive for 12 months following the Closing unless a claim based on an alleged breach was identified through a notice given to Morton prior to the expiration of that 12-month period.

18.    On October 24, 2024, and October 31, 2024, BCAP delivered official written notices to Morton (JTX-43, 46) asserting a variety of alleged breaches of the SPA and advising that it intended to use the entire Indemnity Holdback to recover a portion of its alleged Losses. BCAP submitted an official notice to NAFTA on October 31, 2024 (JTX-45), terminating the NAFTA Agreement based on BCAP's claims that NAFTA had failed to perform its obligations under the agreement and had violated a confidentiality provision of that agreement.  Following these notices, BCAP provided additional information regarding its claims in notices sent in November (JTX-52) and December of 2024 (JTX-57), consistent with BCAP's right under Section 7.13 of the SPA to "provide to Seller all documentation reasonably necessary for Seller to have an understanding of the amounts withheld in respect of Pending Claims."

19.    The October 31, 2024, notice (JTX-46) sent to Morton alleged the provision of inaccurate financial statements with regard to payroll and accounts payable in violation of Sections 2.15(a) and (b) of the SPA, but the notice did not specifically identify the withdrawal by Morton of approximately $7.4 million prior to the sale.

20.    Plaintiffs responded to the notices on November 7 (JTX49, JTX-50) and December 2, 2024 (JTX-56).  BCAP provided a response on December 4, 2024 (JTX-57).

21.    Regarding Direct Indemnity Claim Notices, SPA Section 7.7 provides that "[i]f the indemnifying party disputes a Claim for indemnification or any portion thereof, the indemnifying party shall notify the indemnified party in writing (which writing shall set forth the grounds for such objection) within such thirty (30) days, whereupon the indemnified party and the

7

indemnifying party shall meet and attempt in good faith to resolve their differences with respect to such Claim or any portion of such Claim.  If the recipient does not provide a written notice of dispute within such thirty (30) days, the recipient will be deemed to have accepted responsibility for the Losses set forth in such notice and will have no further right to contest the validity of such notice.  If the recipient provides a written notice of dispute and the dispute has not been resolved within such thirty (30) days after the recipient provides a written notice of dispute, the party delivering will be free to pursue such remedies as may be available to it under this Agreement, any other Transaction Document or Applicable Law."

### The SPA's Lien Provisions

22.    Section 7.13 of the SPA provides that "Buyer shall not permit the Indemnity Holdback to be subject to any lien, covenant, or other limitation to any lender to Buyer or an Affiliate of Buyer[.]"  However, that same Section continues, "Notwithstanding the foregoing, the Buyer shall have the right to collaterally assign (or has already collaterally assigned) to its senior lender all of its right, title and interest in, to and under this agreement as collateral for the financing arrangements provided (or to be provided) to buyer to assist with the consummation of the acquisition contemplated hereby."

23.    On November 1, 2023, BCAP allowed its senior lender, Pinnacle Bank, to file a UCC-1 (JTX-14) claiming a security interest in all of its assets, including all deposit accounts of Millennium.

### The SPA's Payroll Provisions

24.    Section 2.11(d) of the SPA required Morton to represent that the payroll that "became due on October 25, 2023" had been paid prior to the Closing.  In Section 2.16, Morton also represented that Millennium did not have "any liabilities, indebtedness or obligations of any

8

nature (whether absolute, accrued, contingent or otherwise, whether known or unknown, matured or unmatured and whether due or to become due)" except as otherwise noted in that Section.

25.     At all relevant times, Millennium paid its payroll obligations in arrears, meaning that a payroll obligation incurred for a certain period would not be paid until after that period.  The SPA closed on November 1, 2023.  Millennium's payroll for work performed between October 16, 2023, and October 31, 2023 amounted to $212,268.85.

26.     Section 9.1 of the SPA clarified that "any accounting term used and not otherwise defined in this Agreement has the meaning assigned to such term in accordance with [Generally Accepted Accounting Principles ("GAAP")]."  The Parties do not dispute that, under accrual-basis accounting, the timing of an account payable depends on when it is incurred, not when it is paid.

### The SPA's Accounts Payable Provisions

27.     Section 2.11(c) of the SPA required Millennium to pay "accounts payable and notes payable" that accrued prior to the Closing and to either pay or identify on Schedule 2.11(b) (referred to as the "Estimated Closing Date Balance Sheet") any "expected accounts payable."

28.     Section 1.3(c) required that the Estimated Closing Date Balance Sheet would "be prepared and determined accurately and in a manner consistent with [Millennium's] past practices including the same procedures, practices, judgments, and estimates . . ."

29.     Morton contends that Millennium was a cash-basis taxpayer prior to Closing.  In cash-basis accounting, payables are booked when invoices are paid rather than when the services underlying the invoices are performed.

30.     BCAP has identified $147,824.45 in accounts payable that it claims were incurred prior to the Closing Date.

### *Millennium's Financial Statements and Disclosures*

31.    Section 2.16 of the SPA required that Morton disclose all of Millennium's "liabilities, indebtedness or obligations of any nature (whether absolute, accrued, contingent or otherwise, whether known or unknown, matured or unmatured and whether due or to become due)," except as otherwise noted in that Section.  Under this section of the Disclosure Schedule, Morton entered "None."

32.    Prior to the Closing, Morton withdrew all cash from MHF's accounts (totaling approximately $7.4 million) except for $104,530.45.

### *Morton's Consulting and Support Obligations*

33.    In Section 2.9 of the SPA, Morton represented that, "Immediately following the Closing, all of the Assets will be owned, leased or available for use by the Company Parties on terms and conditions substantially identical to those under which, immediately prior to the Closing, each Company Party owns, leases, uses or holds available for use such Assets."

34.    In Section 8.1 of the SPA, Morton agreed that, "In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the parties will take such further action (including the execution and delivery of such further instruments and documents) as any other party reasonably may request, all at the sole cost and expense of the requesting party."

### *Morton's Confidentiality and Non-Competition Obligations*

35.    In Section 5 of the NAFTA Agreement (a Transaction Document), Morton caused NAFTA to agree to "treat all Confidential Information as strictly confidential, not to disclose Confidential Information or permit it to be disclosed, in whole or in part, to any third party without the prior written consent of [MHF]."

36.    In Section 2 of her Equityholder Restrictive Covenant Agreement, Morton promised to refrain from providing or offering "products or services that are competitive, in whole or in part, with the products and services developed, marketed, licensed, sold, distributed, or otherwise provided or offered by [MHF]."

### *Morton's and NAFTA's Consulting Obligations*

37.    Plaintiff NAFTA provides training and certifications to fitness instructors.

38.    Plaintiff NAFTA provided such services to Millennium personnel prior to Plaintiff Morton's sale of Millennium to Defendant.

39.    On November 1, 2023, in connection with the SPA, BCAP entered into the NAFTA Agreement with NAFTA.

40.    Under the NAFTA Agreement, NAFTA agreed to continue providing training and certification services to Millennium "in a professional and workmanlike manner in accordance with the highest industry standards for similar services."  In exchange, Millennium agreed to pay NAFTA $100,000 per year, with the term of the agreement ending October 31, 2028.

41.    On November 1, 2023, BCAP also caused Millennium to enter into the Consultant Agreement with Lerwick 13 Consulting LLC, an entity owned and controlled by Morton, whereby Morton would personally perform all services under the Consultant Agreement.  Morton, through Lerwick 13 Consulting LLC, agreed to "devote…best efforts and significant business time, energy, and skill" in providing "advice and expertise in connection with directing and ensuring a productive transition of the operations of [MHF] related to fitness and wellness training and the relationships related thereto."

42.    On October 24, 2024, BCAP issued a letter to Lerwick 13 Consulting LLC (JTX-42), terminating the Consultant Agreement.

11

43.     On October 31, 2024, BCAP issued a letter to NAFTA (JTX-45), purporting to terminate the NAFTA Agreement.

44.     Section 7.2(b) of the SPA (an Excluded Claim) provides that "[Morton] agrees to indemnify and hold harmless the Buyer, its Affiliates and the Company Parties (from and after the Closing), each of their respective Agents, and each of their respective successors and assigns (collectively, the "Buyer Parties"), against, from and in respect of any and all Losses that are incurred by them based upon, arising out of or otherwise in respect of … the non-fulfillment or breach by or on behalf of [Morton] or, at or prior to the Closing, the Company, of any unwaived covenant (for the sake of clarity, only covenants, and not representations or warranties), obligation or agreement, in each case, as contained in [the SPA], any Transaction Document, or in any statement or certificate delivered pursuant to Section 6.1."

### The Side Letter Agreement

45.     In the Side Letter Agreement (JTX-10), Morton agreed that "to the extent [MHF] incurs expenses post-Closing relating to the [Nebraska Equal Opportunity Commission matter], [Morton] shall indemnify and pay all such expenses."

46.     On August 9, 2024, the law firm Dickinson Wright issued a reminder statement relating to an invoice issued to MHF on December 7, 2023, in the amount of $5,522.00 relating to post-Closing work on the Nebraska Equal Opportunity Commission matter.  After such reminder statement, MHF paid the Dickinson Wright invoice for $5,522.00.

### EPA Billing Issues

47.     In November 2020, when Morton still owned and controlled MHF, MHF provided certain fitness services to federal employees, including employees of the Environmental Protection Agency, pursuant to a government contract and related agreements with the employees.  EPA

12

employees paid $13.00 per pay period to MHF for certain fitness services. In November 2020, government personnel advised MHF to cease providing in person services. Although MHF notified EPA employees that they could adjust their paycheck accounts to end the $13.00 payments, MHF continued to receive such payments from multiple EPA employees.

48.     MHF continued to receive these payments up to the Closing Date and for approximately six months after the Closing.

49.     On or about October 23, 2023, Morton withdrew all cash from the bank account in which these payments had been deposited.

50.     In Section 2.15(c) of the SPA, Morton warranted that, prior to the Closing Date, MHF "maintain[ed] accurate books and records reflecting its assets and liabilities and maintains adequate internal accounting controls that provide assurance in all material respects."

51.     In Section 2.33(b)(iv)(B)-(C) of the SPA, Morton warranted that MHF had "complied in all material respects with all Applicable Laws pertaining to each Government Contract" and that "[t]o the Knowledge of [MHF], and except as disclosed on Schedule 2.33(b)(ii), no event has occurred which, with the passage of time or the giving of notice or both, would result in a material violation of any Applicable Law."

52.     In Section 2.33(b)(iv)(E) of the SPA, Morton warranted that MHF had "maintained systems of internal controls, including quality control systems, cost accounting systems, estimating systems, purchasing systems, proposal systems, billing systems and material management systems, that are in compliance with all requirements of the Current Government Contracts and of Applicable Laws."

53.     In Paragraph 2.15(b) of the SPA, Morton warranted that the financial statements provided to BCAP were "true, correct and complete in all material respects, and present fairly and

13

accurately in all material respects the financial condition and the results of operations of the Company Parties as of the respective dates thereof."

54. MHF closed the bank account into which the payroll deposits were being made in May 2024. On February 24, 2025, BCAP and MHF sent a letter regarding the EPA payments to the EPA's Office of Inspector General ("OIG") (JTX-58). The OIG commenced an investigation, which did not produce any criminal referral.

55. BCAP has retained the full amount of the Indemnity Holdback past the final date of November 5, 2025. BCAP's counterclaims in this lawsuit constitute Pending Claims under Section 7.13 of the SPA. Plaintiffs deny all of the claims.