# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SHERRY MORTON, *et al.* | ) |
| | ) |
| Plaintiffs/Counter-Defendants, | ) |
| | ) |
| v. | ) Civil Action No. 1:24-cv-01432-JLH-EGT |
| | ) |
| BCAP GDI 1, INC. | ) |
| | ) |
| Defendant/Counter-Plaintiff. | ) |
| | ) |

**BCAP GDI 1, INC.'S STATEMENT OF CONTESTED FACTS**

As required by District of Delaware Local Rule 16.3(c)(4), Defendant/Counterclaimant BCAP GDI 1, Inc. ("BCAP") submits the following issues of fact that remain to be litigated.

BCAP further intends to offer evidence to rebut evidence offered by Plaintiff/Counter-Defendants Sherry Morton ("Morton") and National Aerobics and Fitness Trainers Association ("NAFTA"). BCAP reserves the right to amend or supplement this statement as part of the meet-and-confer process leading up to trial, in response to Plaintiff/Counter-Defendants' pretrial disclosures and objections, and in response to any pretrial rulings or further orders from the Court.

To the extent BCAP's Statement of Issues of Law that Remain to be Litigated (submitted as Exhibit 5 to this Proposed Order) contains issues of fact, BCAP incorporates those issues of fact by reference. To the extent that any issue of fact BCAP identifies below is more properly an issue of law, BCAP incorporates those statements into BCAP's Statement of Issues of Law that Remain to be Litigated (submitted as Exhibit 5 to this Proposed Order).

To the extent Morton or NAFTA intends or attempts to introduce different or additional facts than those previously disclosed or those disclosed in Plaintiffs/Counter-Defendants' pretrial submissions (including in exchanges among counsel), BCAP reserves the right to contest those facts, to supplement this Exhibit, and to present rebuttal evidence in response to those new facts and arguments. BCAP incorporates by reference its expert reports in support of any proof to be presented by expert testimony.

## I.    COUNTERCLAIM 1 – BREACH OF THE SPA (UNPAID PAYROLL)

1.    Whether Morton violated Paragraph 2.11(d) of the SPA (JTX-07)—in which Morton warranted that MHF had "paid the payroll that became due on October 25, 2023"—when Morton did not pay the payroll that became due on October 25, 2023, or any of the $212,268.85 in payroll that accrued during the pay period of October 16, 2023, through October 31, 2023.

1

2.    Whether Morton violated Paragraph 2.16 of the SPA (JTX-07)—in which Morton warranted that MHF did not have "any liabilities, indebtedness or obligations of any nature (whether absolute, accrued, contingent or otherwise, whether known or unknown, matured or unmatured and whether due or to become due)…except: (a) Liabilities that are accrued and reflected on the balance sheet of [MHF] as of [September 30, 2023], (b) Liabilities that have arisen in the Ordinary Course of Business since [September 30, 2023] and that, individually or in the aggregate, have not had and would not be reasonably expected to have a Material Adverse Effect, (c) obligations to be performed after [November 1, 2023 (the "Closing Date" or "Closing")] under any Contracts, or (d) Liabilities that are listed on Schedule 2.16"—when Morton refused to pay an accrued payroll obligation of $212,268.85 as of the Closing Date, which (a) was not reflected on the September 30, 2023 balance sheet, (b) accrued after September 30, 2023, and did have a Material Adverse Effect on MHF, (c) was not to be paid after closing under any contract, and (d) was not listed on Schedule 2.16.

3.    Whether Counterclaim 1 constitutes an "Excluded Claim" under the SPA (JTX-07). Exhibit A of the SPA defines "Excluded Claim" to included "any Claim by a Buyer Party…for inaccuracies or breaches of any…Government Contracts Matters Representation."  Exhibit A defines "Government Contracts Matters Representations" as "the representations and warranties made in Section 2.33."  In Section 2.33(b)(iv)(E), Morton represented that MHF had "maintained systems of internal controls, including quality control systems, cost accounting systems, estimating systems, purchasing systems, proposal systems, billing systems and material management systems, that are in compliance with all requirements of the Current Government Contracts and of Applicable Laws" and that "transactions have been recorded as necessary to permit preparation of periodic financial statements and to maintain accountability for assets."

2

II.    **COUNTERCLAIM 2 – BREACH OF THE SPA (UNPAID ACCOUNTS PAYABLE)**

4.    Whether MHF accrued the $147,824.45 in accounts payable reflected in JTX-63 [BCAP_00636] prior to the Closing Date.

5.    Whether Morton violated Paragraph 2.11(c) of the SPA (JTX-07)—in which Morton warranted that "[a]ll accounts payable and notes payable of the Company Parties whether shown on the balance sheets included in the Financial Statements or accrued thereafter…have been paid in full as of the Closing Date"—when Morton refused to pay the $147,824.45 in accounts payable accrued prior to the Closing Date.

6.    Whether MHF accrued invoices when payable (rather than when they were paid) prior to Closing when MHF tracked accounts payable and accounts receivable and included these items on its September 2023 Balance Sheet (JTX-03) attached to the SPA at Exhibit 2.15(a).

7.    Whether Counterclaim 2 constitutes an "Excluded Claim" under the SPA (JTX-07). Exhibit A of the SPA defines "Excluded Claim" to included "any Claim by a Buyer Party…for inaccuracies or breaches of any…Government Contracts Matters Representation."  Exhibit A defines "Government Contracts Matters Representations" as "the representations and warranties made in Section 2.33."  In Section 2.33(b)(iv)(E), Morton represented that MHF had "maintained systems of internal controls, including quality control systems, cost accounting systems, estimating systems, purchasing systems, proposal systems, billing systems and material management systems, that are in compliance with all requirements of the Current Government Contracts and of Applicable Laws" and that "transactions have been recorded as necessary to permit preparation of periodic financial statements and to maintain accountability for assets."

8.    Whether, since the terms **"accounts payable and notes payable"** and **"expected accounts payable"** are not capitalized and specifically defined in the SPA, Section 9.1 of the SPA

3

provides that "any accounting term used and not otherwise defined in [the SPA] has the meaning assigned to such term in accordance with GAAP," which in turn is defined in the SPA as the "generally accepted accounting principles as in effect in the United States of America on the Closing Date."

9.      Whether Joint Exhibit 228 accurately summarizes the expenses underlying the $147,824.45 in accounts payable, all of which were for goods or services that MHF received prior to November 1, 2023 and that were paid by MHF after the SPA closing on November 1, 2023.

## III.    COUNTERCLAIM 3 – INACCURATE FINANCIAL STATEMENTS

10.      Whether Morton withdrew approximately $7.4 million in cash from MHF accounts between September 30, 2023, and November 1, 2023.

11.      Whether Morton violated Paragraph 2.16 of the SPA (JTX-07)—in which Morton warranted that MHF did not have "any liabilities, indebtedness or obligations of any nature (whether absolute, accrued, contingent or otherwise, whether known or unknown, matured or unmatured and whether due or to become due) (each, a "Liability" and collectively, the "Liabilities"), except: (a) Liabilities that are accrued and reflected on the balance sheet of the Company Parties as of [September 30, 2023], (b) Liabilities that have arisen in the Ordinary Course of Business since the Statement Date and that, individually or in the aggregate, have not had and would not be reasonably expected to have a Material Adverse Effect, (c) obligations to be performed after the Closing Date under any Contracts, or (d) Liabilities that are listed on Schedule 2.16—when Morton failed to disclose on any balance sheet or Disclosure Schedule withdrawals of approximately $7.4 million in cash from MHF accounts between September 20, 2023, and November 1, 2023.

4

12. Whether Morton violated Paragraph 2.32(x) of the SPA (JTX-07)—in which Morton warranted that "there has not been any event or occurrence that has had, or would reasonably be expected to have, cause or result in, a Material Adverse Effect on [MHF] or its business as presently conducted" and that MHF had not "declared, set aside, or paid any dividend or made any distribution with respect to its equity securities (whether in cash or in kind)"—when Morton did not disclose any dividends or distributions totaling approximately $7.4 million between September 20, 2023, and November 1, 2023.

13. Whether the removal of approximately $7.4 million in cash from MHF's accounts between September 30, 2023, and the November 1, 2023 constituted a "Material Adverse Effect" when the purchase price of MHF was $10 million and the SPA defines "Material Adverse Effect" as "any change, circumstance, fact, event, condition or effect that, individually or with other changes, circumstances, facts, events, conditions or effects, is or could reasonably be expected to cause, result in or have, a material adverse effect on the business, condition (financial or otherwise), assets, liabilities, properties, prospects or results of operations of the Company Parties." JTX-07 (SPA) Exhibit A at 9.

14. Whether the Closing Balance Sheet delivered to Morton on January 29, 2024, accurately reflected that there was a cash shortfall at MHF of approximately $7.4 million between the September 30, 2023, balance sheet and the Closing Date, when Morton did not object to the Closing Balance Sheet in accordance with Paragraph 1.4 of the SPA.

15. Whether Morton or MHF, under Morton's ownership and control prior to the Closing Date, undertook proper procedures to declare a dividend or distribution, or to execute any other action properly transferring to Morton approximately $7.4 million between September 30, 2023, and November 1, 2023.

16.    Whether Morton withdrew $4,000,000 from the M&T bank account ending in 4433 on or about October 17, 2023 (*see* JTX-06).

17.    Whether Morton withdrew $2,347,328.47 from the M&T bank account ending in 4433 on or about October 31, 3023 (*see* JTX-06).

18.    Whether Morton withdrew $771,154.00 from the M&T account ending in 8952 in October 2023 (*see* DTX-229).

19.    Whether any corporate governance documents reflect that MHF authorized any distribution or dividend in the amounts withdrawn from MHF bank accounts in October 2023.

20.    Whether Morton was authorized to remove approximately $7.4 million in cash from MHF's accounts prior to Closing when she insisted on removing the working capital provisions from the SPA (JTX-07), despite warnings from counsel about the effect of this action.

21.    Whether Morton failed to disclosure the removal of approximately $7.4 million in cash from MHF's accounts prior to Closing when her deal counsel and banker circulated draft balance sheets prior to Closing that reflected the cash withdrawals, but Morton ultimately decided not to include the withdrawals on any pre-Closing financial statement or disclosure.

22.    Whether Counterclaim 3 constitutes an "Excluded Claim" under the SPA (JTX-07). Exhibit A of the SPA defines "Excluded Claim" to included "any Claim by a Buyer Party…for inaccuracies or breaches of any…Government Contracts Matters Representation." Exhibit A defines "Government Contracts Matters Representations" as "the representations and warranties made in Section 2.33." In Section 2.33(b)(iv)(E), Morton represented that MHF had "maintained systems of internal controls, including quality control systems, cost accounting systems, estimating systems, purchasing systems, proposal systems, billing systems and material management systems, that are in compliance with all requirements of the Current Government Contracts and of

6

Applicable Laws" and that "transactions have been recorded as necessary to permit preparation of periodic financial statements and to maintain accountability for assets."

23.    Whether Section 2.32 of the SPA required that Morton disclose in the Disclosure Schedules, "since December 31, 2021 … [if any] Company Party has … declared, set aside, or paid any dividend or made any distribution with respect to its equity securities (whether in cash or in kind), except for customary distributions for the purpose of the payment of Taxes on equity securities, or made any dividend or other distribution that is funded, in whole or in part, by a payment under the CARES Act or similar legislation."    Under this section of the Disclosure Schedule, Morton entered "None."

## IV.    COUNTERCLAIM 4 – THEFT AND DESTRUCTION OF INTELLECTUAL PROPERTY

24.    Whether Morton violated Paragraph 2.9 of the SPA (JTX-07)—in which Morton represented that the assets (including intellectual property ("IP")) transferred under the SPA "constitute all of the assets, rights and properties that are used in the operation of [MHF's] business as it is now conducted or that are used or held by [MHF] for use in the operation of [MHF's] business, and taken together, are adequate and sufficient for the operation of [MHF's] business"— when Morton did not transfer all of MHF's IP but rather deleted critical CEO and Business Development files from MHF servers before the Closing Date.

25.    Whether Morton violated Paragraph 2.12(e) of the SPA (JTX-07)—in which Morton represented that MHF had "taken commercially reasonable actions to protect all [MHF] IP that is a Trade Secret from unauthorized use" and that "no employee of any Company Party has transferred or disclosed any Intellectual Property or confidential or proprietary information to any Company Party or to any third party"—when Morton did not protect MHF's IP but rather deleted

7

critical IP from MHF's servers before the Closing Date, transferred the IP to an external hard drive which Morton retained personally after the Closing Date, and later smashed the hard drive with a hammer, making MHF's files on the hard drive permanently unrecoverable.

26.     Whether Morton violated Paragraph 2.12(i) of the SPA (JTX-07)—in which Morton represented that she had "[t]here have been no unauthorized intrusions or breaches of security relating to, or any unauthorized access or use of, any information technology systems, data, Personal Information, Confidential Information or Software in the possession or control of a Company Party"—when  Morton did not prevent unauthorized access to MHF's critical IP but rather retained critical IP on a personal hard drive after the Closing Date without any permission or authorization.

27.     Whether Morton violated Paragraph 2.33(b)(iv)(B) of the SPA (JTX-07)—in which Morton represented that, prior to the Closing Date, she and MHF had "complied in all material respects with all Applicable Laws pertaining to each Government Contract, Government Vendor Subcontract, Teaming Agreement or Government Bid, including…the [Federal Acquisition Regulation ("FAR")] and the FAR Supplements"—when Morton did not preserve records relating to government contracts consistent with FAR Subpart 4.7 but rather deleted those records from MHF's systems.

28.     Whether Morton violated Paragraph 5.3 of the SPA (JTX-07)—in which Morton represented that, "Upon the Buyer's or the Company's request at any time, including any time after the Closing, the Seller will (a) return…all copies of confidential and proprietary information of any Company Party (including the return of any electronic media or device in which such information is contained), and (b) execute and deliver to the Buyer or the Company such other documents as the Buyer or the Company deems necessary or desirable to vest in the Company the

8

sole ownership of and exclusive worldwide rights in and to, all of such Intellectual Property, and certification of such Person that all such information has been returned"—when Morton did not return MHF's confidential and proprietary data after the Closing Date but rather retained it on a personal hard drive before smashing that hard drive with a hammer in early 2025.

29.     Whether Morton instructed MHF's IT vendor, Atruent, to delete critical business files off MHF's servers in August 2023 (*see* JTX-02).

30.     Whether, before deleting these files from MHF's servers, Morton instructed Atruent to copy the files onto a personal hard drive, which Morton retained after Closing (*see* JTX-02).

31.     Whether Morton smashed the hard drive in early 2025 (after she filed this lawsuit) and destroyed the only physical copy of the files deleted from MHF's servers. *See* D.I. 96, Memorandum Order regarding Sanctions.

32.     Whether it is possible for BCAP to determine whether all the files and IP that Morton deleted from MHF servers were fully restored.

33.     Whether the deleted files and IP were material to the success of MHF's business operations.

34.     Whether MHF had access to the deleted files at the times necessary to submit bids on government contracts or conduct other business operations after the Closing Date.

35.     Whether MHF lost bids on government contracts with the U.S. Marine Corps, Federal Bureau of Investigation, and Immigration and Customs Enforcement after the Closing Date that the company otherwise would have won (or had a better chance of winning) if MHF personnel had access to the deleted files and IP.

9

36.     Whether BCAP and/or MHF incurred expenses, investigation costs, and loss of productivity after the Closing Date due to the efforts necessary to cure Morton's deletion and destruction of critical IP.

37.     Whether several sections of the SPA—namely, Sections 2.9, 2.12(e), 2.12(i), 2.33(b)(iv)(B), and 5.3—required that Morton protect, preserve, return, and deliver Millennium's business records and intellectual property pursuant to Morton's contractual obligations and applicable laws relating to government contracts.

## V.     COUNTERCLAIM 5 – FAILURE TO TRANSITION OWNERSHIP

38.     Whether Morton violated her Consultant Agreement (JTX-09)—in which Morton promised to "work alongside and in coordination with other [MHF] personnel to provide advice and expertise in connection with directing and ensuring a productive transition of the operations of [MHF] related to fitness and wellness training and the relationships related thereto"—when Morton did not support new management at MHF but rather delayed transitioning full access to critical accounts and demanded additional payment for services she had already agreed to render.

39.     Whether Morton violated Paragraph 2.9 of the SPA (JTX-07)—in which she represented that, "Immediately following the Closing, all of the Assets will be owned, leased or available for use by the Company Parties on terms and conditions substantially identical to those under which, immediately prior to the Closing, each Company Party owns, leases, uses or holds available for use such Assets"—when MHF's QuickBooks and Vimeo accounts were not available for use on terms and conditions identical to those immediately prior to the Closing Date because new management at MHF did not have full access to those accounts.

40.     Whether Morton violated Paragraph 8.1 of the SPA (JTX-07)—in which Morton promised that, "In case at any time after the Closing any further action is necessary to carry out

10

the purposes of this Agreement, each of the parties will take such further action (including the execution and delivery of such further instruments and documents) as any other party reasonably may request, all at the sole cost and expense of the requesting party"—when Morton did not take further actions following BCAP and MHF's requests to fully transfer access to and control of the QuickBooks and Vimeo accounts but rather delayed such transfer of access and control for several months.

41.    Whether BCAP and new management at MHF had full access to and control of MHF's QuickBooks account immediately after closing.

42.    Whether BCAP and new management at MHF had full access to and control of MHF's Vimeo account immediately after closing.

43.    Whether Morton continued to access and control MHF's QuickBooks account after closing.

44.    Whether Morton continued to access and control MHF's Vimeo account after closing.

45.    Whether Morton violated her Consultant Agreement when she demanded an additional $20,000 per week payment for services already promised under the terms of her Consultant Agreement (*see* JTX-09).

46.    Whether Morton accepted responsibility for the Losses in Counterclaim 5 when Morton did not respond within 30 days to BCAP's properly served Official Notice for indemnification on October 31, 2024, and Section 7.7 of the SPA (JTX-07) states, "If the recipient does not provide a written notice of dispute within such thirty (30) days, the recipient will be deemed to have accepted responsibility for the Losses set forth in such notice and will have no further right to contest the validity of such notice."

11

## VI.    COUNTERCLAIM 6 – WRONGFUL DISCLOSURE OF CONFIDENTIAL INFORMATION AND WRONGFUL COMPETITION

47.    Whether Morton violated Section 5 of the NAFTA Agreement (JTX-08)—in which Morton promised to "treat all Confidential Information as strictly confidential, not to disclose Confidential Information or permit it to be disclosed, in whole or in part, to any third party without the prior written consent of [MHF]"—when Morton did not keep the terms of the NAFTA Agreement confidential but rather disclosed them to MHF contractors and employees who were not parties to the NAFTA Agreement without the prior written consent of MHF or any of its personnel.

48.    Whether the terms of the NAFTA Agreement (JTX-08) were "generally available to the public."

49.    Whether Morton violated Section 2 of the Equityholder Restrictive Covenant Agreement (JTX-11)—in which Morton promised to refrain from providing or offering "products or services that are competitive, in whole or in part, with the products and services developed, marketed, licensed, sold, distributed, or otherwise provided or offered by [MHF]"—when Morton submitted a bid on a government solicitation after the Closing Date for CPR/AED and First Aid Training services that MHF also provided or offered.

50.    Whether Morton violated Section 2 of the Equityholder Restrictive Covenant Agreement (JTX-11)—in which Morton promised to refrain from providing or offering "products or services that are competitive, in whole or in part, with the products and services developed, marketed, licensed, sold, distributed, or otherwise provided or offered by [MHF]"—when Morton submitted a bid on a government solicitation after the Closing Date for Fitness Curriculum Design services that MHF also provided or offered.

12

**VII.    COUNTERCLAIM 7 – BREACH OF NAFTA, CONSULTING, AND EQUITYHOLDER RESTRICTIVE COVENANT AGREEMENTS**

51.    Whether NAFTA breached its obligations under the NAFTA Agreement (JTX-08)—in which NAFTA agreed to provide specified fitness training and certification services to MHF personnel consistent with "highest industry standards"—when NAFTA's offerings were not consistent with highest industry standards because, among other reasons:

a.    NAFTA's courses were days shorter than industry-leading alternatives;

b.    NAFTA offered limited in-person and hands-on instruction;

c.    NAFTA's trainers did not have advanced degrees;

d.    NAFTA listed trainers on its website who did not actually work there;

e.    NAFTA offered the same courses as other, more reputable organizations, but at higher prices;

f.    Morton copies training materials from other unrelated organizations instead of creating her own;

g.    NAFTA training materials lacked substance and quality.;

h.    NAFTA was not actually an Association;

i.    NAFTA is not recognized within the fitness certification and credentialing industry; and

j.    None of NAFTA's certifications have been accredited aside from a single group exercise course.

52.    Whether NAFTA violated the NAFTA Agreement (JTX-08)—in which NAFTA agreed to provide "training (and accompanying NAFTA Certifications) to any [MHF] staff member…that attends the…NCCA GEI Workshop"—when NAFTA agreed to provide the

13

training for the NCAA GEI Workshop but demanded an additional charge for the certification exam for that course.

53.     Whether Morton violated her Consultant Agreement (JTX-09)—in which Morton, through her consulting business (Lerwick 13 Consulting LLC), promised to "devote…best efforts and significant business time, energy, and skill" in providing "advice and expertise in connection with directing and ensuring a productive transition of the operations of [MHF] related to fitness and wellness training and the relationships related thereto"—when Morton did not support BCAP or new management at MHF after the Closing Date but rather deleted critical files, divulged confidential information, failed to transition full access to and control of key accounts, and refused to provide business development support, proposal support, and market research support.

54.     Whether Plaintiffs accepted responsibility for the Losses in Counterclaim 7 when Morton did not respond within 30 days to BCAP's properly served Official Notice for indemnification on December 4, 2024, and Section 7.7 of the SPA (JTX-07) states, "If the recipient does not provide a written notice of dispute within such thirty (30) days, the recipient will be deemed to have accepted responsibility for the Losses set forth in such notice and will have no further right to contest the validity of such notice."

55.     Whether, in her Consultant Agreement (a Transaction Document), Morton agreed to "work alongside and in coordination with other [MHF] personnel to provide advice and expertise in connection with directing and ensuring a productive transition of the operations of [MHF] related to fitness and wellness training and the relationships related thereto[A1.."

## VIII.   COUNTERCLAIM 8 – SPECIAL INDEMNITY FOR LITIGATION EXPENSES

56.     Whether Morton breached the Side Letter Agreement (JTX-10)—in which Morton agreed that "to the extent [MHF] incurs expenses post-Closing relating to the [Nebraska Equal

Opportunity Commission matter], [Morton] shall indemnify and pay all such expenses"—when Morton did not pay a December 7, 2023, invoice from the law firm Dickinson Wright to MHF relating to post-Closing work on the Nebraska Equal Opportunity Commission matter in the amount of $5,522.00.

57.    Whether BCAP or MHF was required to request reimbursement from any insurance policy before Morton became responsible for paying the $5,522.00 in legal fees from Dickinson Wright.

58.    Whether Morton accepted responsibility for the Losses in Counterclaim 8 when Morton did not respond within 30 days to BCAP's properly served Official Notice for indemnification on October 31, 2024, and Section 7.7 of the SPA (JTX-07) states, "If the recipient does not provide a written notice of dispute within such thirty (30) days, the recipient will be deemed to have accepted responsibility for the Losses set forth in such notice and will have no further right to contest the validity of such notice."

59.    Whether, relating to the Side Letter Agreement (JTX-10), indemnification regarding MHF's post-closing expenses relating to the [Nebraska Equal Opportunity Commission Matter], such indemnification shall be "up to the insurance policy deductibles [which exceed the $5,522 invoice] … [and] shall not be subject to the Threshold Amount or any other deductible or retention."

## IX.    COUNTERCLAIM 9 – WRONGFUL COLLECTION OF EPA FEES

60.    Whether Morton violated Paragraph 2.15(c) of the SPA (JTX-07)—in which Morton warranted that, prior to the Closing Date, MHF "maintain[ed] accurate books and records reflecting its assets and liabilities and maintains adequate internal accounting controls that provide assurance in all material respects"—when MHF's books and records were not accurate because

15

they did not account for $156,284.00 in fees that Morton caused MHF to wrongfully collect prior to Closing from government employees at the Environmental Protection Agency ("EPA") beginning in December 2020.

61.    Whether Morton violated Paragraph 2.33(b)(iv)(B)-(C) of the SPA (JTX-07)—in which Morton warranted that MHF had "complied in all material respects with all Applicable Laws pertaining to each Government Contract" and that "[t]o the Knowledge of [MHF], and except as disclosed on Schedule 2.33(b)(ii), no event has occurred which, with the passage of time or the giving of notice or both, would result in a material violation of any Applicable Law"—when Morton knew but did not disclose in Schedule 2.33(b)(ii) that she caused MHF to collect $156,284.00 in fees from EPA employees prior to Closing for services that MHF was not providing under the applicable government contract despite instructions from the government to cease collecting such fees.

62.    Whether Morton violated Paragraph 2.33(b)(iv)(E) of the SPA (JTX-07)—in which Morton warranted that MHF had "maintained systems of internal controls, including quality control systems, cost accounting systems, estimating systems, purchasing systems, proposal systems, billing systems and material management systems, that are in compliance with all requirements of the Current Government Contracts and of Applicable Laws"—when Morton had not in fact maintained internal controls, accounting systems, and billing systems that complied with the requirement of MHF's EPA contract but instead caused the wrongful collection of $176,140.29 in fees from EPA employees (reflecting fees collecting both prior to and after Closing).

63.    Whether Morton violated Paragraph 2.15(b) of the SPA (JTX-07)—in which Morton warranted that the financial statements provided to BCAP were "true, correct and complete

16

in all material respects, and present fairly and accurately in all material respects the financial condition and the results of operations of the Company Parties as of the respective dates thereof"— when the financial statements were not accurate because they did not account for a potential liability in the form of $156,284.00 in fees wrongfully collected from EPA employees.

64.     Whether MHF was authorized to continue collecting payments from EPA employees from November 2020 onward for in-person fitness services that the company was not providing.

65.     Whether Morton was entitled to withdraw $549,000.00 on October 23, 2023, from the account containing the $156,284.00  in wrongfully collected fees from EPA personnel.

66.     Whether Morton's conduct causing MHF's collection of fees from EPA personnel resulted in a potential liability for MHF of $176,140.29.

67.     Whether the collection of fees from EPA personnel required BCAP to make a disclosure to the EPA Office of Inspector General ("OIG").

68.     Whether BCAP and/or MHF incurred losses after the Closing Date as a result of Morton's pre-closing conduct with respect to the collection of fees from EPA personnel.

69.     Whether BCAP and/or MHF incurred losses after the Closing Date as a result of the EPA OIG investigation.

70.     Whether the EPA OIG investigation remains open as of the date of this trial.

71.     Whether Morton accepted responsibility for the Losses in Counterclaim 9 when Morton did not respond within 30 days to BCAP's properly served Official Notice for indemnification on December 4, 2024, and Section 7.7 of the SPA (JTX-07) states, "If the recipient does not provide a written notice of dispute within such thirty (30) days, the recipient will be

17

deemed to have accepted responsibility for the Losses set forth in such notice and will have no further right to contest the validity of such notice."

## X.     FACTS APPLICABLE TO ALL COUNTERCLAIMS

72.     Whether Plaintiffs accepted responsibility for BCAP's claimed Losses set forth in its properly served Official Notices on October 24, 2023, October 31, 2023, and December 4, 2023, when Plaintiffs (1) failed to respond to certain claims or (2) failed to dispute certain claims in an Official Notice within 30 days as required by Section 7.7 of the SPA (JTX-07), which states, "If the recipient does not provide a written notice of dispute within such thirty (30) days, the recipient will be deemed to have accepted responsibility for the Losses set forth in such notice and will have no further right to contest the validity of such notice."  Additionally, whether Morton's December 2, 2024, letter to BCAP constituted an effective notice of dispute under the SPA (JTX-07) when it was only emailed (not mailed) and Section 9.4(b) of the SPA states, "Notices will be deemed given on the first Business Day after being sent, prepaid, by nationally recognized overnight courier that issues a receipt or other confirmation of delivery."

73.     Whether the parties to the SPA (JTX-07) ever effectuated an amendment to the SPA that modified any of Morton's obligations under any contract when Paragraph 9.3 of the SPA stated, "This Agreement may be amended only by the execution and delivery of a written instrument by the Buyer and the Seller."  JTX-07 (SPA) ¶ 9.3.

74.     Whether the representations, warranties, and other terms of the SPA (JTX-07) reflected accrual-basis accounting under Generally Accepted Accounting Principles ("GAAP") as opposed to cash-basis accounting when Paragraph 9.1 of the SPA stated, "any accounting term used and not otherwise defined in this Agreement has the meaning assigned to such term in accordance with GAAP."

75.     Whether any of Morton's conduct in any Counterclaim caused indemnifiable losses under the SPA (JTX-07), including "any loss, damage, due, penalty, fine, interest, cost, amount paid in settlement, judgment, Liability, Tax, Lien (other than Permitted Liens), cost of investigation, expense and fee (including court costs and attorneys' or other professionals' fees and expenses paid or incurred)."  JTX-07 (SPA), Exhibit A at 8.

76.     Whether Section 9.4(b) of the SPA required that all such notices be "sent, prepaid, by nationally recognized overnight courier that issues a receipt or other confirmation of delivery."

19